FOGGY BOTTOM ASSOCIATION,
Petitioner,

v.

DISTRICT OF COLUMBIA BOARD
OF ZONING ADJUSTMENT,
Respondent,

George Washington University,
Intervenor.

No. 99–AA–1105.

District of Columbia Court of Appeals.

Argued Nov. 15, 2000.

Decided Feb. 14, 2002.

Cornish F. Hitchcock, Washington, for petitioner.

Jerry A. Moore, III, with whom Jonathan W. Lipshie was on the brief, Washington, for intervenor.

Robert A. Malson filed a brief for the District of Columbia Hospital Association as amicus curiae.

Robert R. Rigsby, Corporation Counsel, and Charles L. Reischel, Deputy Corporation Counsel, filed a statement in lieu of brief for respondent.

Before TERRY, FARRELL, and RUIZ, Associate Judges.

TERRY, Associate Judge.

The Foggy Bottom Association ("FBA") seeks review of an order of the Board of Zoning Adjustment ("BZA") which granted to George Washington University ("GWU") a special exception allowing it to build a new hospital on 23rd Street, N.W., across the street from its present hospital. Before this court the FBA asserts that the BZA erred in refusing to postpone its approval of the special exception until after the need for an Environmental Impact Statement had been determined. The FBA further argues that the BZA's order was not supported by substantial evidence and that the BZA failed to give "great weight" to the views of the affected Advisory Neighborhood Commission, as it is

required by statute to do in cases such as this. We reject all of these arguments and affirm the BZA's order.

## I

In July 1998 GWU applied for a special exception to build a replacement hospital at 900 23rd Street, N.W.[1] At that time the site of the proposed hospital, which is located in a residentially zoned area,[2] was a surface parking lot with 265 spaces. The proposed new hospital will be a six-story building with 400,000 square feet on a footprint of approximately 61,000 square feet.[3] The site is roughly trapezoidal in shape, bounded by 23rd Street on the east, I Street on the south, 24th Street on the west, and New Hampshire Avenue on the northwest.[4]

Under applicable regulations,[5] a "university hospital" may be built in an R–5 district only if the BZA grants a special exception. See 11 DCMR §§ 210.1, 352.1 (1995); see also 11 DCMR § 3108 (authorizing BZA to grant special exceptions).

1. Previously, in April 1986, GWU had submitted to the BZA a "plan for developing the campus as a whole, showing the location, height and bulk, where appropriate, of all present and proposed improvements...." 11 DCMR § 210.4 (1995). The BZA approved this campus plan, despite objections by the Advisory Neighborhood Commission and others, and expressly found the site at issue in this case to be a "preferred site for medical and medical-related facilities." BZA Case No. 14455, Final Order dated February 25, 1988.

2. The site lies partially in an R–5–D district ("medium-high density") and partially in an R–5–E district ("high density"). See 11 DCMR § 105.1(a)(5).

The R–5 districts are designed to permit a flexibility of design by permitting in a single district [with certain exceptions not pertinent here] all types of urban residential development if they conform to the height, density, and area requirements established for these

districts under [applicable regulations]. The R–5 districts shall also permit the construction of those institutional and semi-public buildings that would be compatible with adjoining residential uses and which are excluded from the more restrictive Residence districts.

11 DCMR § 350.1.

3. District Hospital Partners, L.P., a limited partnership consisting of GWU and Universal Health Services, had earlier sought, and ultimately obtained, a Certificate of Need from the District of Columbia State Health Planning and Development Agency recognizing the public need for a new institutional health facility. See D.C.Code § 44–406 (2001), formerly codified as D.C.Code § 32–356 (1998).

4. New Hampshire Avenue and 23rd Street meet at Washington Circle, which abuts the northern tip of the proposed hospital site.

5. See 11 DCMR §§ 210, 302, 322, 332, and 352.

To obtain a special exception, an applicant must show that the university use "is not likely to become objectionable to neighboring property because of noise, traffic, number of students, or other objectionable conditions." 11 DCMR § 210.2. The BZA held four days of hearings, extending from November 1998 to April 1999, to address these issues.

### A. *Proceedings before the BZA*

GWU presented several witnesses to speak in favor of the proposed hospital. John F. Williams, GWU's Vice President for Health Affairs, testified about the need for a new facility to offer "high quality, community-responsive clinical services to the District of Columbia residents and a provision of outstanding medical education and clinical research opportunities to our students and faculty." Philip Schaengold, Chief Executive Officer and Managing Director of GWU Hospital, said that merely renovating the current hospital would be prohibitive in terms of time and cost. Ronald Skaggs, a principal in HKS, Inc., and Philip Tobey, of Tobey and Davis, the architects of the proposed new hospital, stated that it would be "compatible with the scale, materials, massing and design of the existing neighborhood."

Al Ingle, GWU's Associate Vice President for Business Affairs, and Louis Slade, a principal of Gorove/Slade and Associates, testified about GWU's parking arrangements. Dr. Ingle confirmed that the total number of university parking spaces would not drop below 2,700, as required by the campus plan (see note 1, *supra*). Mr. Slade, a traffic and parking expert, testi-fied that the estimated 1,300 automobiles going to and from the current parking lot would be replaced by an anticipated thirty delivery vehicles each day to the planned loading dock on 24th Street.[6] He said that GWU would be able to maintain the minimum 2,700 parking spaces required under the campus plan by using valet-assisted parking at current facilities, as well as spaces available at the nearby Kennedy Center for the Performing Arts.[7]

At the close of the hearing on November 18, 1998, the BZA requested that the record be supplemented with certain additional information. Accordingly, a few weeks later, GWU submitted further traffic analyses and a copy of the contract between the University and the Kennedy Center for off-street parking. The Department of Public Works ("DPW"), which had sought additional time to evaluate the project, filed a report with the BZA on December 30, expressing major concerns about GWU's application, which included the possible effect that the proposed hospital would have on the neighboring residential area, the potential for vehicular and pedestrian conflicts, and the proposed location of the emergency entrance and the loading dock. At the next hearing on January 5, 1999, the BZA took note of these concerns and directed the University to meet with representatives of the DPW in an effort to resolve any difficulties. After a series of discussions between GWU and the DPW, as well as the Advisory Neighborhood Commission (ANC) and other neighborhood groups, the DPW proposed several

---

6. The Advisory Neighborhood Commission contested Dr. Ingle's estimate, asserting that deliveries to the current hospital were already at twice that level.

7. Several community supporters, including Wayne Curtis, Donald Temple, Lance Slaughter, Richard Mavery, Chairman of the State-wide Health Coordinating Council, Dr. Byron Cooper, President of the Medical Society of the District of Columbia, and Vincent Keane, Executive Director of Unity Health Care, also testified in favor of granting the special exception for the proposed hospital.

amendments to the hospital's plan, which were divided into three general categories.

First, with respect to the emergency entrance, the DPW recommended that emergency traffic enter the hospital from 23rd Street, not New Hampshire Avenue. It also urged that a stop light be installed south of the New Hampshire emergency exit, to be synchronized with the traffic signals at Washington Circle, as well as signs and flashing lights to alert both drivers and pedestrians to the location of the exit. Further, the DPW suggested that different paving material be used for the emergency driveway to enhance pedestrian safety. Second, as to the loading dock, the DPW recommended that the depth of the loading area be increased and that the doors to the loading dock be kept closed when the dock is not in use. The DPW also proposed that deliveries be limited to the hours between 7:00 a.m. and 6:00 p.m. and that the hospital recommend to its service providers that they make deliveries outside of rush hours.[8] Third, regarding the main entrance to the hospital, the DPW recommended that the sidewalks surrounding the proposed hospital be made wider, especially on 23rd Street. The DPW expressed the view that the new main entrance would present "slightly more potential pedestrian/vehicular conflicts than the existing hospital site, due to the greater amount of pedestrian traffic on the west side of 23rd Street, N.W." Having

made these recommendations, the DPW concluded that its proposed revisions to the plan offered "probably the best overall balancing of the hospital's needs and the community's needs."

Testimony in opposition to the proposed hospital was offered on behalf of the Foggy Bottom Historic District Conservancy,[9] the Foggy Bottom Mews Condominium, and the Claridge House Apartments, all of which objected that the proposed hospital would increase traffic congestion. Maria Tyler, Commissioner for ANC District 2A–03, raised concerns about health, safety, and noise, as well as the effect the hospital would have on the visual character of the neighborhood.[10] Ellen McCarthy, a planning expert, and Everett Carter, an engineering professor and transportation expert, both testified in opposition to the new hospital. Through these witnesses, the FBA made several points.

First, the FBA objected to the noise and congestion that the planned sixty-foot loading dock on 24th Street would create. Even accepting GWU's estimates of thirty-two truck deliveries daily, there would be sixty-four truck movements, including one eighteen-wheeler each day. Mr. Carter pointed out that 24th Street was six feet narrower than I Street, where the loading dock for the current hospital is located, and for that reason it was not suited to

8. The DPW acknowledged that the increase in truck deliveries on 24th Street would be offset by the elimination of vehicular traffic going to and from the current parking lot.

9. Foggy Bottom is the long-established name of a neighborhood in the District of Columbia, just west of the White House, which includes the entire campus of George Washington University as well as numerous residences, businesses, and government offices. The Foggy Bottom Historic District was listed in the National Register of Historic Places in 1987. *See* 11 DCMR § 1521.1.

10. While the BZA was considering GWU's application, the Comprehensive Plan for the area was amended to note that the Foggy Bottom Historic District "is enhanced by Washington's remaining 19th century alley dwellings which are virtually unique to the city" and that "GWU must take account of the residential and historic district status of Foggy Bottom in any future development...." 10 DCMR §§ 1318.13, 1342.1(b), 46 D.C. Register 1751, 1766 (February 19, 1999).

queuing trucks, particularly given its close proximity to a residential area, which could be subjected to noise, congestion, and diesel fumes. Furthermore, the FBA asserted that the loading dock could present serious pedestrian/vehicle conflicts.

Nor was the FBA appeased by the DPW's and GWU's attempts to mitigate these concerns. It argued that the DPW's proposal that GWU should require its providers not to make deliveries to the hospital during rush hours was merely precatory and hence unenforceable. The proposal to mask the loading dock by landscaping a small triangular plot of land at the intersection of 24th Street and New Hampshire Avenue would cover only thirty-five feet of the proposed sixty-foot dock area. Similarly, the FBA was not satisfied with promises to ask delivery trucks not to use the neighboring residential streets, particularly since the District "does not routinely designate truck routes within the city, except for the delivery of materials to construction sites." The FBA was also concerned that closing the loading dock doors between deliveries could exacerbate the noise problems, "given the noise associated with raising and lowering 13–foot high, 12–foot wide doors for the minimum of 64 truck movements."

Second, the FBA raised numerous concerns about the noise from traffic going to and from the hospital, especially emergency vehicles entering the hospital from 23rd Street and exiting onto New Hampshire Avenue. The FBA also noted the potential increase in conflicts between pedestrians and vehicles due to the hospital's location and the siting of the main entrance.

Third, the FBA doubted that GWU would be able to maintain a minimum of 2,700 parking spaces, as required under the campus plan, after discounting the 265 spaces lost at the proposed site. Specifically, the FBA argued that any spaces made available to the University under the agreement with the Kennedy Center could not be used to satisfy the campus plan (a) because the 2,700 spaces were supposed to be within the campus boundary, which these spaces were not,[11] and (b) because the agreement limited use of the Kennedy Center parking spaces to the hours between 6:00 a.m. and 7:00 p.m., because spaces could become unavailable "on any given date," and because the agreement could be terminated with or without cause upon ninety days' written notice.

Finally, the FBA complained that GWU had failed to prepare an Environmental Impact Statement ("EIS"), as required by the District of Columbia Environmental Protection Act, before applying for the special exception.

### B. The BZA Decision

In a seventeen-page, single-spaced order, the BZA granted the special exception by a 3–1 vote,[12] but imposed nineteen conditions that GWU had to meet in order to mitigate the impact of the new hospital. Those conditions generally involved the matters agreed upon by the DPW and GWU in the course of the hearings. The BZA concluded that GWU had met its burden of proving that the special exception was in harmony with the general purpose and intent of the zoning regulations and maps, and that the project would not

11. The Kennedy Center is approximately four blocks southwest of the proposed hospital site.

12. Vice Chairperson King dissented from the decision to grant the special exception "because [she could not] in good conscience say that the project will have no deleterious impact on the neighborhood and surrounding properties." Her objections mirrored those raised by the FBA.

have an adverse effect on the local community. In addition, the order stated:

> The Board accorded ANC 2–A the "great weight" to which it is entitled. In doing so, the Board fully credited the unique vantage point that ANC 2–A holds with respect to the impact of the proposed hospital upon the ANC's constituents. However, the Board concludes that the ANC has not offered persuasive advice that would cause the Board to find that the replacement hospital is contrary to the Zoning Regulations and would adversely affect the use of neighboring property, particularly in light of the conditions imposed on approval of the Applicant's proposal.

Citing 11 DCMR § 3205.4, the BZA stated that the conditions attached to the approval of the special exception "shall be treated as a condition to the issuance of the building permit or certificate of occupancy.... Failure to abide by the conditions, in whole or in part, shall be grounds for the revocation of any building permit or certificate of occupancy issued pursuant to this order." [13]

Finally, the BZA concluded that an EIS was not necessary at this time because the "environmental review [would] occur as part of the building review process if the Board granted the Application." It ruled that under D.C.Code § 8–109.03 (2001) [14] and Mayor's Order 92–151, the Department of Consumer and Regulatory Affairs (DCRA) was the "lead agency" responsible for preparing an EIS, [15] and that "[t]he necessary environmental assessment will be carried out as part of the permitting process for construction of the new hospital."

### C. *Subsequent Events*

In the course of seeking a building permit, District Hospital Partners (see note 3, *supra* ) filed an Environmental Impact Screening Form ("EISF") with the Environmental Health Administration ("EHA") of the Department of Health as the lead agency responsible for such reviews pursuant to Mayor's Order 98–86. After District Hospital Partners provided EHA with all of the pertinent environmental information, EHA stated in a memorandum to the DCRA that there was no need for an EIS. [16]

### II

Before this court the FBA makes three arguments. First, it contends that the BZA erred in granting the special exception for the proposed hospital before any agency determined whether there was a need for an EIS. Second, the FBA asserts that the conditions attached to the BZA's approval of the special exception do not satisfy the substantial evidence test. Finally, FBA contends that the BZA did not give "great weight" to the ANC's views.

■ Under D.C.Code § 2–509(e)

---

13. 11 DCMR 3205.4 provides:

> Any person who owns, controls, occupies, maintains, or uses any building, structure, or land or any part [thereof] ... shall at all times comply with any condition to the issuance of the certificate of occupancy for the building, structure, or land, or part thereof.

14. Formerly codified as D.C.Code § 6–983 (1995).

15. In fact, however, Mayor's Order 92–151 had been superseded by Mayor's Order 98–86, which made the Department of Health the lead agency. *See* 45 D.C. Register 3980 (June 19, 1998).

16. By the time this case came before us for argument, construction of the new hospital was well under way. We note, however, that the FBA did not apply for a stay of the BZA's order.

(2001),[17] "all agency decisions must be accompanied by written '[f]indings of fact and conclusions of law [which] shall be supported by and in accordance with reliable, probative, and substantial evidence.'" *Citizens Coalition v. District of Columbia Board of Zoning Adjustment,* 619 A.2d 940, 946 (D.C.1993) (footnote omitted). We have held that the substantial evidence test has three parts:

> (1) findings must be made on each contested issue of fact; (2) the decision must rationally follow from the facts; i.e., there must be a "rational connection between the facts found and the choice made" ... and (3) there must be sufficient evidence to support each finding, i.e., "such relevant evidence as a reasonable mind might accept as adequate...."

*Id.* (citations omitted); *accord, e.g., Perkins v. District of Columbia Dep't of Employment Services,* 482 A.2d 401, 402 (D.C. 1984). However, "[t]his court is not to substitute its judgment for that of the agency, and thus the decision of the BZA [should] be upheld provided there is a rational basis for it." *Citizens Coalition,* 619 A.2d at 947 (citations omitted); *see also, e.g., National Cathedral Neighborhood Ass'n v. District of Columbia Board of Zoning Adjustment,* 753 A.2d 984, 986 n. 2 (D.C.2000).

## A. *EIS Review*

■ The FBA argues vehemently that the BZA should have postponed its decision on GWU's application for a special exception until after the Department of Health had considered whether an EIS was required. We need not decide whether the BZA erred in failing to wait for an EIS review before granting the special exception because, even if it did, we are satisfied that any such error was harmless.

Under the District of Columbia Environmental Policy Act ("DCEPA"), the purpose of requiring an EIS

> is to promote the health, safety and welfare of District of Columbia ... residents, to afford the fullest possible preservation and protection of the environment through a requirement that the environmental impact of proposed ... privately initiated actions be examined before implementation....

D.C.Code § 8–109.01 (2001), formerly D.C.Code § 6–981 (1995). Accordingly:

> Whenever ... a board ... approves a major action that is likely to have substantial negative impact on the environment, if implemented, the ... board ... shall prepare or cause to be prepared, and transmit, in accordance with subsection (b) of this section, a detailed EIS at least 60 days prior to implementation of the proposed major action....

D.C.Code § 8–109.03(a) (2001), formerly D.C.Code § 6–983(a) (1995).[18] Further, the DCEPA provides that when there are several agencies involved in authorization of a project, a designated "lead agency" shall be responsible for "oversee[ing] the preparation of a single, omnibus EIS...."

---

17. Formerly D.C.Code § 1–1509(e) (1999).

18. The EIS requirement applies only to a "major action," *i.e.,* "any action that costs over $1,000,000 [in 1989 dollars, adjusted annually for inflation] and that may have a significant impact on the environment." D.C.Code § 8–109.02(2) (2001), formerly D.C.Code § 6–982(2) (1995). Under the regulations implementing the DCEPA, "a signifi-

cant impact on the environment" includes any action that "might disrupt or divide the physical arrangement of an existing community" or one that "might cause significant adverse change in existing level of noise in the vicinity of the action." 20 DCMR § 7201.2(i), (n), 44 D.C. Register 2800 (May 9, 1997).

D.C.Code § 8–109.07(a) (2001), formerly D.C.Code § 6–987(a) (1995).

During the hearings before the BZA, the FBA emphasized that GWU had failed to prepare an EIS, as the law required. The BZA ruled that in accordance with the DCEPA and Mayor's Order 92–151, the designated lead agency was the DCRA.[19] From this premise the BZA concluded that "the necessary environmental impact assessment [would] be carried out as part of the permitting process for construction of the new hospital." The FBA contends that the BZA erred in so holding because it misconstrued the applicable regulations. One such regulation provides:

Before an agency [or] board ... shall approve any major action, or issue any lease, permit, license, certificate, or other entitlement or permission to act for a proposed major action, the environmental impact of the action must be adequately considered and reviewed by the District government, as provided in these regulations.

20 DCMR § 7200.1, 44 D.C. Register 2799. Moreover, the FBA argues, District government agencies are required

to integrate the [EIS] process with other planning processes at the earliest stages of their planning for major actions they intend to propose, when the widest range of feasible alternatives is open for consideration, and before there has been any irretrievable commitment of resources, in order to ensure that planning and decisions reflect environmental values, in order to avoid delays later in the process, and to head off potential conflicts.

20 DCMR § 7200.2, 44 D.C. Register 2799. The FBA contends that, under the DCEPA, the BZA should have postponed granting the special exception until after the Department of Health had reviewed the need for an EIS, since such a review would have been "enormously helpful to the BZA as it considered the noise, traffic and related questions that it is obliged to consider in a special exception case under section 210 of the Zoning Regulations."

While the FBA's argument as to the appropriate construction of the EIS regulations might be persuasive in different circumstances, we need not consider the merits of this argument in this case. As the District of Columbia Hospital Association rightly states in its *amicus* brief, any error by the BZA in failing to require an EIS review before granting the special exception was at worst harmless, since the Department of Health—the designated lead agency—ultimately ruled that no EIS was needed.[20]

---

19. All parties agree that the BZA harmlessly erred in determining that the lead agency was the DCRA rather than the Department of Health.

20. GWU and *amicus* cite two cases which, they argue, support their view that the BZA committed no error in deciding not to consider the need for an EIS before granting the special exception. While we need not, and do not, decide whether the BZA erred, we conclude that neither of the two cited cases should be viewed as supporting the BZA's decision.

In *Glenbrook Road Ass'n v. District of Columbia Board of Zoning Adjustment,* 605 A.2d 22 (D.C.1992), the petitioner had waived any objection to the granting of a special exception prior to any review of the need of an EIS. *Id.* at 37. No such waiver occurred here. Conversely, in *Citizens Coalition, supra,* the BZA considered the DCRA's review of the need for an EIS in its decision to grant the special exception. 619 A.2d at 950. GWU's and *amicus'* reliance on this case does not help their argument, because the crux of the FBA's complaint is that the BZA failed in this instance to do what it did in *Citizens Coalition, i.e.,* to consider the EIS in determining whether to grant the special exception.

D.C.Code § 8–109.03(a) (2001), formerly D.C.Code § 6–983(a) (1995), requires that an EIS be prepared at least sixty days "prior to implementation of the proposed major action." The key requirement, therefore, is that the EIS review occur before the major action is actually "implemented," which indeed happened here. Following the BZA approval of the special exception, District Hospital Partners submitted an EISF to the Department of Health in the course of applying for a building permit. On December 7, 1999, the Department of Health determined that no EIS was needed because the new hospital was not "likely to have [a] substantial negative impact on the environment." *See* 20 DCMR § 7205.1, 44 D.C. Register 2807. Under the DCEPA, the environment can be harmed only if a proposed major action violates environmental standards *and* that major action is "implemented." The Department of Health determined, before any implementation of the hospital project occurred—*i.e.*, before construction actually began—that the proposed hospital would not violate any environmental standard. Consequently, even if the BZA had been armed with this information, it could have had no effect on the decision to grant the special exception. The BZA's error, if any, in granting the special exception before the need for an EIS was determined by the Department of Health was plainly harmless.[21]

The FBA nevertheless contends that if the BZA had deferred action on the application for a special exception, it (the FBA) could have presented its views to the Department of Health as that department

was considering whether an EIS was required. But there is no requirement in any statute or regulation that an entity such as the FBA, or even an affected ANC, have notice or input *during* an EIS determination. If the Department of Health had concluded that an EIS was necessary, *then* the FBA and the ANC would have had an opportunity to comment pursuant to 20 DCMR § 7208, 44 D.C. Register 2809. Since the process never reached that point, we find no merit in the FBA's argument.

The FBA also claims that the EIS determination involved issues that the BZA should have considered in its assessment of whether the proposed hospital would create "objectionable conditions" in the neighborhood. *See* 11 DCMR § 210.2. The Department of Health memorandum, which found that there was no need for an EIS, did state that there was no remaining "air margin" in the 23rd Street corridor just south of Washington Circle. Nevertheless, the Department determined that "the project will most likely not exceed the health standard for any air in the vicinity of the replacement hospital." Thus the Department's conclusion that the proposed hospital met environmental standards had no bearing on the BZA's separate determination that the new hospital would not create "objectionable conditions." While the FBA may (or may not) be right that, as a matter of process, the BZA should have postponed its decision until after the need for an EIS was determined, we are satisfied that any error by the BZA in this

---

21. Several other courts have similarly held that failure to conduct an EIS review before approving an application is harmless error when the subsequent EIS review finds no significant environmental impact. *See, e.g., Richland Park Homeowners Ass'n v. Pierce,* 671 F.2d 935, 943 (5th Cir.1982); *City of* *Newport Beach v. Civil Aeronautics Board,* 214 U.S.App. D.C. 462, 466, 665 F.2d 1280, 1284 (1981); *Upper Pecos Ass'n v. Stans,* 500 F.2d 17, 19 (10th Cir.1974); *Township of Ridley v. Blanchette,* 421 F.Supp. 435, 449 (E.D.Pa. 1976).

regard was harmless on the facts of this case.[22]

### B. *Substantial Evidence*

■ Contrary to petitioner's arguments, the BZA received, and identified in its order, substantial evidence to support the conditions that it attached to its approval of the special exception. The substantial evidence test requires that an agency make factual findings which are rationally related to the evidence presented, *i.e.*, that there be substantial support in the evidence for the factual findings. When there is "a fatal omission of fact-finding along the continuum between testimony and final decision," that decision will be overturned. *Citizens Ass'n of Georgetown v. District of Columbia Zoning Comm'n*, 402 A.2d 36, 42 (D.C.1979). The agency's reasoning process, moreover, must be "articulat[ed] with reasonable clarity...." *Dietrich v. District of Columbia Board of Zoning Adjustment*, 293 A.2d 470, 473 (D.C.1972).

The FBA asserts that the BZA failed to explain adequately how it reached the determination that it did, given the evidence presented at the hearings. Specifically, the FBA argues that the conditions attached to the BZA's approval of the special exception are unenforceable, and therefore that the BZA's conclusions based on those conditions do not satisfy the substantial evidence test. We are satisfied, after considering the record as a whole, that the conditions attached to the special exception are based on the recommendations made by the DPW to mitigate some of the negative aspects of GWU's original proposal, and that there is factual support for those recommendations.

■ The order limits truck deliveries to the hours between 7:00 a.m. and 6:00 p.m. It also requires that GWU recommend to its vendors that deliveries, when possible, not be made during the morning and evening rush hours. The FBA argues that this condition is weak and unenforceable, and hence not supported by substantial evidence. We disagree. The order strictly limits the period in which deliveries can be made to the proposed hospital and then

---

22. The FBA offers three additional criticisms of the BZA's handling of the EIS issue. First, the FBA argues that under section 8–109.03(a) (formerly section 6–983(a)) of the DCEPA, GWU, rather than any agency, should have prepared the EISF as the proponent of the "major action." This argument is beside the point. The issue here is whether the BZA erred in failing to wait for an EIS review before granting the special exception, not who was responsible for preparing the EISF.

Second, the FBA asserts that the BZA incorrectly applied section 8–109.07 (formerly section 6–987), which addresses the designation of a lead agency for multi-agency authorizations, because that section does not apply to proposals by private parties. This argument is unsupported by the language of the Code and its legislative history. Moreover, it again obscures the central issue raised here, which is the timing of the EIS review, not the identity of the lead agency.

Finally, the FBA maintains that the BZA should have treated itself as the lead agency in accordance with 20 DCMR § 7203.1, 44 D.C. Register 2805, which provides that "the District agency first responsible for the first District government authorization of the project shall be the lead agency." The regulations, however, are inherently contradictory. 20 DCMR § 7299.1, 44 D.C. Register 2814, defines "lead agency" as "the District government agency designated by the Mayor to have primary responsibility for coordinating the preparation of an Environmental Impact Statement," which is currently the Department of Health pursuant to Mayor's Order 98–86. While this argument highlights the difficulty of navigating the regulations, it again inappropriately focuses on the identity of the lead agency, an irrelevant issue here, rather than the timing of the EIS review.

requires that the hospital request non-rush hour deliveries within this period. The FBA's argument assumes that the BZA should have prohibited all rush hour deliveries. The BZA ruled, to the contrary, that while rush hour deliveries should be discouraged, there was no reason to require a total prohibition of such deliveries. We are satisfied that this ruling was reasonable and properly reflected the BZA's balancing of the interests of all the affected parties, as expressed through their testimony and other submissions. Moreover, any failure to comply—more precisely, perhaps, any systematic or persistent non-compliance—with the restriction on rush hour deliveries can be brought to the attention of authorities in connection with, for example, the renewal of the hospital's occupancy permit.[23]

■ The order further requires that GWU "add appropriate landscaping" so as to "buffer" the sixty-foot loading dock facing 24th Street. The FBA asserts that this condition is insufficient because only thirty-five feet of the loading dock can be effectively concealed. Again this argument misinterprets the BZA ruling. The BZA reasonably concluded that the partial landscaping, coupled with closing the loading dock doors between deliveries, would "lessen any adverse visual impact," and hence would not prove unduly objectionable to the residents of the immediate area. The BZA was not obliged to reduce to zero any "adverse visual impact," but only to take the views of all interested parties into account in reaching a decision about the landscaping and to strive to accommodate

those views—which could not be fully reconciled—in its final decision.

■ The FBA also criticizes the condition that GWU must include in its construction contracts a provision requiring contractors to locate and provide parking for their own workers during the hospital's construction. The FBA asserts that GWU cannot effectively enforce this condition because it is impossible to determine which cars parked near the construction site are driven by construction workers. Again, however, we conclude that this condition is reasonable and supported by the record. The required contract clause places contractors on notice that no parking facilities are provided and that alternative arrangements must be made. Some may perhaps breach the contract, but it is not unreasonable to expect that the majority of the contractors will make sure that some alternative parking is available, instead of leaving their workers' parking needs to chance. It is also reasonable to rely on the contractors themselves to enforce this requirement, since any contractor that fails to do so will be in breach of its own contract with GWU and subject to contractual penalties.

■ Finally, the FBA contends that the order does not clearly explain how GWU will continue to provide the minimum 2,700 parking spaces required by its campus plan. In reaching that target, the FBA maintains, GWU should not be allowed to include the 128 spaces provided under contract by the Kennedy Center because those spaces are not guaranteed, nor are they located within the campus boundaries

---

**23.** Similarly, the FBA complains that requiring GWU to ask vendors not to use local residential streets and to petition the DPW to prohibit truck traffic through those streets is an unenforceable condition and hence unsupported by substantial evidence. Again, this argument assumes that unless trucks are totally denied access to residential streets, the order is ineffective. The evidence, however, reasonably supports the BZA's finding that something less than an outright prohibition would be sufficient to meet the FBA's concerns.

as required by the campus plan. The BZA states as fact that at least 2,700 spaces will exist at any given time. This finding is supported by the record and is secured by the condition imposed by the BZA's order that no certificate of occupancy will be issued for the proposed hospital until a garage subject to Application No. 16409 is open and operational. This garage will replace 200 of the 265 lost parking spaces. Valet parking at another facility on campus will add another 125 spaces. Combined, these new spaces easily replace the 265 lost spaces at the proposed hospital site, without even considering the contested 128 spaces at the Kennedy Center.

Overall, the FBA's argument that the conditions attached to the approval of the special exception are not adequately supported in the record is without substance. The BZA received a great deal of evidence on these matters and, after undertaking a detailed review of that evidence, concluded that the conditions it imposed were sufficient to ensure that the proposed new hospital would not create objectionable conditions. The FBA fails to acknowledge that, under 11 DCMR § 3205.4, *supra* note 13, the conditions attached to the approval are binding, and that subsequent issuance of the building permit or certificate of occupancy depends on compliance with them. Furthermore, such permits or certificates, once issued, can also be revoked if those conditions are not met.

### C. *"Great Weight"*

■ Finally, the FBA asserts that the BZA did not give the ANC's views "great weight" as required by statute. ANCs "occupy a special position in the District of Columbia." *Bakers Local Union No. 118 v. District of Columbia Board of Zoning Adjustment*, 437 A.2d 176, 179 (D.C.1981). Under D.C.Code § 1–261(d) (1999), the issues and concerns raised by ANC officials "shall be given great weight during the deliberations by the governmental agency and those issues shall be discussed in the written rationale for the governmental decision taken." [24] Concerning the "great weight" requirement, this court has said:

> [A]n agency must elaborate, with precision, its response to the ANC issues and concerns . . . . the agency must articulate why the particular ANC itself, given its vantage point, does—or does not—offer persuasive advice under the circumstances.
>
> . . . "[G]reat weight" implies explicit reference to each ANC issue and concern as such, as well as specific findings and conclusions with respect to each.

*Kopff v. District of Columbia Alcoholic Beverage Control Board*, 381 A.2d 1372, 1384 (D.C.1977). However, section 1 261(d) "does not require special deference to the views of an ANC but, rather, that an agency address its concerns with particularity." *Committee for Washington's*

---

**24.** The statute governing Advisory Neighborhood Commissions was extensively amended in 2000, after the BZA issued its order in this case; in particular, the section about "great weight" was completely rewritten. The language requiring government agencies and boards to give "great weight" to the views of ANCs now appears in D.C.Code § 1–309.10(d)(3)(A) (2001), which reads as follows:

The issues and concerns raised in the recommendations of the [Advisory Neigh-

borhood] Commission shall be given great weight during the deliberations by the government entity. Great weight requires acknowledgment of the Commission as the source of the recommendations and explicit reference to each of the Commission's issues and concerns.

Since the BZA's decision was issued when the former version of the ANC statute was in effect, we express no view here as to the effect that this statutory change might have on the instant case if it were applicable.

*Riverfront Parks v. Thompson*, 451 A.2d 1177, 1194 (D.C.1982).

The BZA gave the ANC's views the "great weight" that section 1–261(d) requires. Its order specifically declared that "[t]he Board accorded ANC 2–A the 'great weight' to which it is entitled. In doing so, the Board fully credited the unique vantage point that ANC 2–A holds with respect to the impact of the proposed hospital upon the ANC's constituents." It then went on to address the issues and concerns raised by the ANC, which for the most part echoed the issues and concerns raised by the FBA. At one point the BZA stated that it was

> not persuaded by the testimony of ANC witness McCarthy concerning alleged "disruptive" noise generated by the new hospital, and instead concurs with the applicant that the hospital is not a noise-intensive use that would tend to create objectionable noise impacts. In addition, any adverse noise associated with the hospital will be diminished through effective mitigation measures taken pursuant to this Order, such as the prohibition against deliveries to the loading dock before 7:00 a.m. or after 6:00 p.m.

Similarly, the BZA was

> not persuaded by ANC 2–A's arguments that mitigation measures, such as paving and warning lights designed to enhance pedestrian safety, would impair any visual connection along 23rd Street between Washington Circle and the Lincoln Memorial.

The "great weight" requirement, as *Kopff* makes clear, does not mean that the BZA must accept the views of the ANC no matter what. All that the law demands is that the views of the ANC be specifically addressed, and not ignored or overlooked, in the BZA's decision. On this record we are satisfied that the BZA gave the necessary "great weight" to the ANC's concerns and hence met the requirements of D.C.Code § 1–261(d).

### III

Even if we were to assume that the BZA erred in granting a special exception to GWU for its proposed new hospital before the need for an EIS was determined, such error, if any, was harmless. Shortly after the BZA granted the special exception, the Department of Health concluded that no EIS was required because the proposed hospital would not have a negative environmental impact. Consequently, even if the EIS determination had been completed before the BZA considered GWU's application for a special exception, it would have had no effect on the application. In addition, we are satisfied that the BZA gave the ANC's views "great weight" as required by statute and that its decision is supported by substantial evidence. Accordingly, the BZA's approval of the special exception for the new hospital is

*Affirmed.*