**NEIGHBORS AGAINST FOXHALL GRIDLOCK, et al., Petitioners,**

v.

**DISTRICT OF COLUMBIA BOARD OF ZONING ADJUSTMENT, Respondent,**

and

**The Field School, Intervenor.**

**No. 01–AA–53.**

District of Columbia Court of Appeals.

Argued Feb. 5, 2002.

Decided Feb. 28, 2002.

Eric Von Salzen, with whom Marta I. Tanenhaus, Washington, DC, was on the brief, for petitioners.

Phil T. Feola, with whom Deborah B. Baum, Paul A. Tummonds, Jr., and Amy E. Goldfrank, Washington, DC, were on the brief, for intervenor.

Robert R. Rigsby, Corporation Counsel, Charles L. Reischel, Deputy Corporation Counsel, and William J. Earl, Assistant Corporation Counsel, filed a statement in lieu of brief for the District of Columbia Board of Zoning Adjustment.

Before FARRELL, RUIZ, and GLICKMAN, Associate Judges.

FARRELL, Associate Judge:

The District of Columbia Board of Zoning Adjustment (the Board or the BZA) granted an application for a special exception filed by the Field School and The Morris and Gwendolyn Cafritz Foundation, permitting establishment of a private school on property occupied by the Cafritz House, a residence on Foxhall Road, Northwest. In considering the application, the principal issue the Board had to contend with was the acknowledged risk that location of the Field School on Foxhall Road would impair traffic safety on that north-south roadway, specifically on a portion the Board described as "narrow, curved, and hilly, with poor visibility." Petitioners, who are coalitions of property owners residing near the proposed school site, raise substantive and procedural challenges to the Board's decision granting the special exception. They contend, in summary, that the Board failed to give the required "great weight" to the opposition filed by the Advisory Neighborhood Commission (ANC); that in finding the proposed school use in harmony with the zoning regulations and that it would not "become objectionable to . . . nearby property" because of traffic and other conditions, the Board paid insufficient attention to national highway design standards and otherwise failed to articulate its reasons clearly; and that the Board's inadvertent failure to record a portion of the evidentiary hearing resulted in the de facto "disqualification" of two votes—leaving less than the required majority—in favor of the application. After considering each of these contentions, we affirm the Board's decision.

## I.

 Just recently this court re-emphasized the statutory requirement that issues and concerns raised by ANC officials " 'be given great weight during the deliberations by the governmental agency,' " and that " 'those issues ... be discussed in the written rationale for the governmental decision taken.' " *Foggy Bottom Ass'n v. District of Columbia Bd. of Zoning Adjustment,* 791 A.2d 64, 76 (D.C.2002) (quoting D.C.Code § 1–261(d) (1999)). As reflected both in the statute and in this court's decisions, the latter requirement means that "an agency must elaborate, with precision, its response to the ANC issues and concerns," articulating "why the particular ANC itself, given its vantage point, does or does not offer persuasive advice under the circumstances." *Kopff v. District of Columbia Alcoholic Beverage Control Bd.,* 381 A.2d 1372, 1384 (D.C.1977).[1] On the other hand, as we stated in *Kopff,* " 'great weight' in this context is not a quantum requirement," *id.* at 1384; and the agency " 'is not obliged to follow the ANC's recommendations or adopt its views.' " *Draude v. District of Columbia Bd. of Zoning Adjustment,* 582 A.2d 949, 953 (D.C.1990) (citation omitted). The ANCs do not enjoy " 'expert' status, entitled to special deference as such," *Kopff,* 381 A.2d at 1384; *see Foggy Bottom,* 791 A.2d at 76; rather, the agency must "pay specific attention to the source, as well as the content, of ANC recommendations, giving them whatever deference they merit in the context of the entire proceedings, including the evidence and views presented by others." *Kopff,* 381 A.2d at 1384.

The Board took note of its "great weight" responsibility and explained that it had "carefully considered the ANC's reports." But it made that consideration vulnerable to challenge by erroneously pointing out that, at the time the ANC made its final recommendation, "it [the ANC] did not have the benefit of hearing" the final report submitted by the Department of Public Works (DPW) concerning the traffic impacts of the proposed school and whether those could be ameliorated. It is true that DPW's administrator, Kenneth Laden, did not *testify* about the results of DPW's investigation and its recommendation until after the ANC's final position had been submitted, but DPW's report stating its conclusions had been circulated beforehand, and the ANC specifically referenced DPW's recommendations in its final statement of opposition dated July 18, 2000. The ANC's recommendation was not deficient for any lack of familiarity with what traffic experts (either the parties' experts or DPW) were recommending.

 Despite this error, we are persuaded that the Board "c[a]me to grips with the ANC view" in the manner required by the statute. *Kopff,* 381 A.2d at 1384. With regard to traffic impacts, the ANC explained that it had previously recommended "conditional approval" of the application because the initial traffic plan proposed by the school envisioned two entrances to the school from Foxhall Road and "a 10–car 'stacking' lane" for cars traveling south and turning left into the

---

1. As the Board pointed out, the statutory section pertaining to "great weight" was revised in 2000 and expressly requires the agency, among other things, to "articulate with particularity and precision the reasons why the [ANC] does or does not offer persuasive advice under the circumstances." D.C.Code § 1–309.10(d)(3)(B) (2001). Petitioners do not contend that this amendment alters the level of consideration agencies must accord the ANC's views.

school grounds.[2] In the meantime, though, "the applicant [had] amended its traffic plan at least partly in response to recommendations by [DPW]," so that the northern entrance would be closed and the stacking lane reduced "from 10 to 3 cars." These changes, in the ANC's view, would likely have an objectionable impact on traffic safety and congestion in the neighborhood. The Board concluded otherwise, "credit[ing] the opinion of DPW and the applicant's traffic experts that the proposed school can be located on Foxhall Road in a manner that would not create objectionable traffic conditions." In a lengthy portion of its opinion headed "Traffic Impacts," it explained why it accepted DPW's view that "if certain conditions, which are incorporated in this order, are met," traffic safety would not be adversely affected. In particular, it noted testimony that the proposed left-turn lane could accommodate stacking of as many as five cars, and that DPW would engage in "further refinements" during the design process to maximize safety in the turn lane and at the stop light and intersection being created. In sum, although the Board well knew the ANC's position that nothing short of a ten-car stacking lane would insure safety,[3] it chose to credit contrary expert opinion that a combination of alternative design measures would achieve that result. This was within its authority to give the ANC's views "whatever deference they merit[ed] in the context of the entire proceedings, *including* the evidence and

views presented by others," *Kopff*, 381 A.2d at 1384 (emphasis added), but without being bound by them.

## II.

As a private school seeking to locate in a residential neighborhood, the Field School was obliged to obtain a special exception. *See* 11 DCMR § 206 (1995). A special exception will be granted if the BZA finds that the proposed use is in harmony with the general purpose and intent of the Zoning Regulations and the Zoning Map, 11 DCMR § 3104.1, 46 D.C.Reg. 7891 (1999), and meets the special conditions listed in 11 DCMR § 206. At issue here is the condition, recited in 11 DCMR § 206.2, that "[t]he private school shall be located so that it is not likely to become objectionable to adjoining and nearby property because of . . . traffic . . . conditions."

DPW recognized that locating the proposed school on Foxhall Road "presents a potential traffic safety problem due to restricted sight lines, drivers traveling at speed in excess of the posted 25 mph limit, and high traffic volumes." DPW proposed, and in granting the special exception the Board adopted, what the Board termed "numerous, stringent conditions" designed to deal with the "traffic and public safety" issues. Of particular importance are the following two:

\* \* \* \*

2. "Stacking" was the term used by the experts to refer to alignment of vehicles one behind the other in a center turn lane. This new lane, achieved by widening the roadway, would also have a taper and a deceleration component before the stacking area was reached.

3. Although the ANC complained of the proposed closing of the north entrance to the school site, it did not explain why in its view that closing would create a traffic safety prob-

lem. DPW, by contrast, had stated its view that having one entrance (with a signal light) instead of two would increase traffic safety.

The ANC had also expressed concern about the inadequacy of design measures addressing storm water runoff. The BZA addressed this concern specifically in sections of the decision entitled "Other Objectionable Conditions" and "Impacts on Use of Neighboring Property."

14. Before a certificate of occupancy may be issued, Foxhall Road adjacent to the Field School property must be widened to allow the development of [a] southbound left turn lane on Foxhall Road into the proposed school site. The construction must provide a minimum sight distance of 305 feet for northbound traffic and 364 feet for southbound traffic. The length of the combined taper, deceleration, and stacking distance must be a minimum of 474 feet. The applicant shall submit its design and engineering plans to DPW for review and approval. The final design and engineering plans must be approved by DPW.

\* \* \* \*

16. Before a certificate of occupancy may be issued, a traffic control signal must be located at the southern entrance to stop traffic on Foxhall Road to allow safe turns into and out of the school property. The traffic control signal must provide a priority green light to traffic on Foxhall Road and only be activated to stop northbound Foxhall Road traffic when there are vehicles stacked in the left turn lane.

■ Petitioners first contend that the Board failed in its duty to "give[ ] full and reasoned consideration to all material facts and issues," *Dietrich v. District of Columbia Bd. of Zoning Adjustment*, 293 A.2d

470, 473 (D.C.1972), by disregarding expert testimony that a left turn lane at this location would require far greater road length than is available at the site. Specifically, they cite their expert's testimony that the length of the new lane required to meet national design standards [4] would extend well beyond the boundary of the Field School's frontage on Foxhall Road (the School could contribute the land needed to widen the road only along its own frontage). We do not agree, however, either that the Board ignored this testimony or that it was cavalier in its treatment of the industry standard. First, the Board specified that the combined distance of the left turn lane must be "a minimum of 474 feet," doing so after it noted the testimony of James Long, an expert for the applicants, "that the frontage of the subject property could actually provide 512 feet for the combined taper, deceleration lane, and stacking lane"—additional footage DPW could presumably take into account in the "further refinements" the Board contemplated. Second, although this total frontage was still substantially short of what petitioners' expert said was required by the AASHTO standards, the Board reasonably looked to those standards—as had DPW—as "general guidelines to be applied to the extent possible," rather than as fixed norms applicable to every situation.[5] The complete package of conditions the Board imposed to reduce the expected impact of traffic—including staggered hours of school opening, mandatory car pooling by students, and shuttle bus ser-

4. The standards referenced were recommendations by the American Association of State Highway and Transportation Officials (AASHTO).

5. The foreword to the AASHTO guidelines, *A Policy on Geometric Design of Highways and Streets*, includes the following language with regard to the manner in which the guidelines are to be implemented: "The intent of this

policy is to provide guidance to the designer by referencing a recommended range of values for critical dimensions. Sufficient flexibility is permitted to encourage independent designs tailored to particular situations." American Association of State Highway and Transportation Officials, *A Policy on Geometric Design of Highways and Streets*, (1994) at xiiii.

vice to Metrorail and other locations—convinced it that the left turn lane could be engineered in such a way as to minimize the risk of accidents.[6]

We nonetheless would be troubled by the Board's conclusion as to traffic if we agreed with petitioners' suggestion at oral argument that DPW—on whose recommendation the Board heavily relied—took for granted that a left turn lane (and traffic signal) would solve the traffic safety problems, leaving only for debate the precise length and configuration of the lane (*e.g.*, stacking length versus taper or deceleration length). But we are satisfied that DPW, and the Board in turn, took nothing for granted. At his first scheduled appearance before the Board, DPW's administrator Laden declared that, although in reviewing the initial proposal DPW "supported most of the traffic plan as provided by the Applicant," the agency was not going to make a recommendation without further study and site inspection:

> Our bottom line position is, we are not going to recommend to this Board, or anyone else that a left-lane turn be established if it cannot be done safely, and before we can make a definitive decision as to whether this would be a safe lane, we do want to take a second look at it.

Only after DPW submitted its final report and was questioned about it at a hearing, did the Board accept its recommendation that a left turn lane, combined with other conditions, would resolve the traffic concerns. The Board did not prejudge the traffic issue but addressed it in a reasoned and reasonable manner.

■ Petitioners further contend that the Board failed to address, "except in the most perfunctory way," the broader question of whether the proposed school would be "in harmony with the general purpose and intent" of the residential zoning in this neighborhood. Petitioners are correct that a private school is not permitted as a matter of right in a residential (R–1–A) zone; a special exception must be sought and obtained. But we do not agree that the Board viewed parsimoniously its role in passing upon the application for a special exception. In stating that its role was "limited," the Board used that term in the precise sense the court did in *Stewart v. District of Columbia Bd. of Zoning Adjustment,* 305 A.2d 516 (D.C.1973):

> Special exceptions, unlike variances, are expressly provided for in the Zoning Regulations. The Board's discretion to grant special exceptions is limited to a determination whether the exception sought meets the requirements of the regulation. The burden of showing that the proposal meets the prerequisite enumerated in the particular regulation pursuant to which the exception is sought rests with the applicant.... [T]he applicant must make the requisite showing, and once he has, the Board ordinarily must grant his application.

*Id.* at 518 (citation omitted). The Board's analysis leading it to conclude that the school would fit harmoniously in the neighborhood cannot fairly be termed perfunctory. It considered the size of the proposed school—in terms of both enrollment and space occupancy—in relation to the character of a residential neighborhood, noting for example that "[w]hile the R–1–A District has a lot occupancy limitation of 40 percent, the proposed school buildings would only occupy 7 percent of the [10.5 acre] property" and "[t]he total impervious surface ... only 27 percent of the proper-

---

6. Indeed, the Board found from testimony that "[ ]the proposed traffic signal, school zone, and warning signs and lights are ex-

pected to have a traffic-calming effect" on a roadway where the speed limits were often ignored.

ty." [7] It considered as well the noise and traffic impacts, storm water run-off, and other objectionable effects before explaining in each instance how conditions on approval of the application could ameliorate them. And lastly, it gave the required "great weight," D.C.Code § 6-623.04 (2001), to the view of the Office of Planning that the proposed school would not be inconsistent with the character of the neighborhood:

> OP observed first that schools by their very nature are associated with residential areas; second, that Foxhall Road, with 17,500 vehicles per day, is a busy arterial road, not a quiet residential collector street; third, the area has already been characterized by a number of institutional uses, including the former Mt. Vernon College, St. Patrick's Church and School, the Kreeger Museum, and several embassies; and finally, that the design of the new school buildings would retain various elements from the existing mansion to evoke a residential feel, the buildings would be "tucked into" the slope to minimize the perceived bulk, and there would be substantial vegetative buffering.[8]

All told, the Board's conclusion that the proposed use was in harmony with the zoning regulations and, as conditioned, would have no adverse impacts on the neighborhood "rationally flow[ed] from findings of fact supported by substantial evidence in the record as a whole." *Draude,* 582 A.2d at 953 (citation omitted). As a matter of substantive law, we find no reason to disturb it.

## III.

Petitioners' final challenge is to a procedural irregularity resulting from the fact that, because of mechanical failure, no recording was made of the direct or cross examination of the applicants' traffic expert, Louis Slade, at the evidentiary hearing.[9] This in turn meant that two members of the five-member Board who were absent personally from all or a portion of that testimony, and later voted to grant the application, had no record of it to review before casting their vote. Petitioners point out that, for the Board to render any decision or order, the affirmative vote of at least three members is required, *see* D.C.Code § 6-641.07(h), and that in order to vote on a decision a Board member must *either* have attended the hearings *or* have read the transcript of any hearing that he or she did not attend. *See* 11 DCMR § 3105.15, 46 D.C.Reg. 7896 (1999). Petitioners therefore argue that the two members who did neither of these in regard to Slade's testimony were "disqualified" from voting, thereby erasing the four-vote majority.

7. Earlier the Board noted the view of other neighbors favoring the application that the school use would "ensure the preservation of green space ... in lieu of alternative development schemes such as a high-density residential development that could pave and cover up to 60 percent of the land."

8. As the Board pointed out, OP had made its recommendation mindful of the District of Columbia Comprehensive Plan's "call to preserve and enhance the quality of stable residential neighborhoods." We do not agree with petitioners that the Board "shut its eyes to the Comprehensive Plan." It is true, as a matter

of law, that the Board has "no power to implement the Comprehensive Plan," *Tenley & Cleveland Park Emergency Comm. v. District of Columbia Bd. of Zoning Adjustment,* 550 A.2d 331, 341 n. 22 (D.C.1988), but, in any case, the Board's analysis—like the OP's—was in keeping with the Plan's injunction to preserve the character of residential neighborhoods.

9. In the absence of a court reporter at the May 10, 2000, hearing, the parties had agreed that the proceedings would be tape recorded.

Intervenors counter that the inability of the two members to review a portion of the record was non-prejudicial given the vast amount of record material they presumptively did review. This naturally gives rise to the question whether an inquiry into prejudice *vel non* is permissible in this context. If, as petitioners argue, the effect of a member's neither attending a hearing nor reading a transcript of it is to disqualify him—to render him ineligible to vote on a matter—then no room would seem to be left for consideration of actual prejudice. But we do not read the regulations in question to impose that disqualification. 11 DCMR § 3105.14, 46 D.C.Reg. 7896 states that "[a] member absent at the decision meeting may cast an absentee vote only if the member attended all of the hearings on the appeal or application." By contrast, § 3105.15, 46 D.C.Reg. 7896 states that "[a] member attending the decision meeting and having read the transcript and reviewed the complete record may participate and may vote even though that member may not have attended any or all of the prior meetings or hearings on the appeal or application." The pivotal distinction is between attendance and absence at "the decision meeting," where, as in this case, the members hear oral argument, exchange views, and ultimately vote. Unlike the member absent from that meeting who must have attended "all of the hearings" to vote, the member attending it need not have attended "any or all" of the prior proceedings. (The two members in question here concededly attended that meeting.) There is the key additional qualification that the latter "have read the transcript and reviewed the complete record," but petitioners read that provision too strictly, in our view, by saying that it permits no imperfection in the record available to a member who was present at the all-important decision meeting. (Indeed, one disposed to read the language

strictly would have to note the distinction between "transcript" and "*complete* record.") Our reading of the regulation must harmonize with the statutory principle that, "[i]n reviewing administrative orders and decisions, . . . [t]he Court may invoke the rule of prejudicial error." D.C.Code § 2–510(b) (2001); *see Arthur v. District of Columbia Nurses' Examining Bd.*, 459 A.2d 141, 146 (D.C.1983). So reading it, we proceed to inquire whether the absence of a record of Slade's testimony can be said to have meaningfully affected the ability of the two members to deliberate and vote.

The answer to that question is no. The parties agree that Slade's testimony would have amounted to under two hundred transcript pages. The entire written record before the Board numbered 2735 pages. The size of the record cannot be determinative, of course, because the reports and testimony of traffic safety experts such as Slade were, as we have seen, of central importance to the Board's task. Yet the centrality of expertise to its consideration of the traffic issues bears negatively on whether there was prejudice from the omission here. The Board received multiple written reports addressing the traffic impacts from experts representing both sides, as well as from the independent experts at DPW and OP. In the main, those experts also testified and were cross examined at the hearings. If the pattern in every other instance held true in the case of Slade, then his testimony on direct was substantially a summary of the detailed analysis provided in his written report, and the cross examination substantially a reprise of the written criticisms made of his analysis by petitioners' experts. Moreover, in their proposed findings of fact and conclusions of law petitioners summarized Slade's testimony at the hearing as having "relied upon his third

traffic report of May 19, 2000"; and they went on to list multiple points on which he had been cross examined and to rebut his conclusions by reciting the testimony and written findings of their experts. All members of the Board thus had at least that familiarity with his live testimony.

Of most significance, perhaps, is that Slade testified *before* DPW made its final (or "second look") study of the expected traffic impacts. DPW's report then became the basis for Slade's final written report [10] and—after thorough cross examination of administrator Laden about DPW's conclusions—the keystone of the Board's findings of fact and conclusions regarding traffic.[11] Slade's oral testimony, in other words, although inadequately preserved for review by individual Board members, had largely been superseded in importance by the time the Board began its deliberations.

█ We cannot help but note, however, that the Board's treatment of the matter of the unrecorded testimony is troubling. The two Board members in question stated on the record their intent to review the transcript of the hearing portions they had missed, yet the Board's decision gives no indication that the recording failure was brought to its attention by those members or staff—at a time when remedial measures, if thought needed, were still feasible. Petitioners thus argue that "the BZA paid so little attention to the evidence that it decided this case without noticing that a part of the hearings had not been recorded." We do not agree with that assessment, even while we are constrained to remind the Board of its obligation to maintain—and to *consider*—"an official record in each contested case, to include testimony and exhibits," D.C.Code § 2–509(c) (2001), presumably meaning a complete record. Based upon the record of these proceedings, including the active questioning of witnesses by all Board members, and the Board's detailed findings of fact and conclusions of law, we reject any suggestion that it did not take seriously its responsibilities in considering the application. The Board's decision, therefore, is

*Affirmed.*

█

10. "The final Gorove/Slade report dated June 2, 2000," the Board noted, was "prepared in response to the final DPW report."

11. *See, e.g.*, paras. 28 and 41 of the Board's opinion:
 According to DPW, use of the site for the proposed private school presents a potential traffic safety problem due to restricted sight lines, drivers travelling at speeds in excess of the posted 25 mph limit, and high traffic volumes. DPW was also concerned that some of the drivers who would be travelling to the school would be relatively young and inexperienced. DPW, therefore, applied conservative engineering requirements and traffic control policies in developing its recommendations. In its report dated May 22, 2000, Ex. 439, DPW stated that the proposed school could be accommodated at the site if certain conditions, which are incorporated in this order, are met. DPW requested that any approval of this application be conditioned upon the applicant meeting DPW's recommended design criteria for the widening of Foxhall Road and the construction of a dedicated left-turn lane, eliminating use of the northern entrance for school traffic, and installing a traffic signal at a relocated southern entrance.
 * * *
 The Board credits the opinion of DPW that, with the conditions recommended by DPW, the proposed private school would not result in objectionable traffic conditions.