*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

## Nos. 12-AA-723 & 12-AA-724

SPRING VALLEY-WESLEY HEIGHTS CITIZENS ASSOCIATION

and

WESTOVER PLACE HOMES CORPORATION, PETITIONERS,

v.

DISTRICT OF COLUMBIA ZONING COMMISSION, RESPONDENT.

AMERICAN UNIVERSITY, INTERVENOR.

On Petition for Review of Orders
of the District of Columbia Zoning Commission
(Nos. 11-07 & 11-07A)

(Argued April 4, 2013                    Decided November 14, 2013)

(Amended March 27, 2014[1])

*Michael Mazzuchi* for petitioners.

*Irvin B. Nathan*, Attorney General for the District of Columbia, *Todd S. Kim*, Solicitor General, *Donna M. Murasky*, Deputy Solicitor General, and *James C. McKay, Jr.*, Senior Assistant Attorney General, filed a statement in lieu of brief in support of intervenor.

---

[1]  After the November 14, 2013, initial publication of this opinion, this court granted petitioners' petition for rehearing and amended the opinion by striking Section II(C)(3) and replacing it with a revised Section II(C)(3).

*Paul J. Kiernan*, with whom *Paul A. Tummonds, Jr.* and *Cary Kadlecek* were on the brief, for intervenor.

Before WASHINGTON, *Chief Judge*, GLICKMAN, *Associate Judge*, and RUIZ, *Senior Judge*.

GLICKMAN, *Associate Judge*:   Because its campuses are in residentially-zoned areas of the District of Columbia, American University ("AU") is required by the District's Zoning Regulations to submit its campus development plans to the District of Columbia Zoning Commission for special exception approval.[2]   The Zoning Commission also must approve AU's applications for further processing of an approved campus plan to permit the construction and use of specific buildings on campus.[3]   Now before us for review are two orders of the Commission

---

[2]   *See* 11 DCMR §§ 210, 3035 (2013); *see also Spring Valley-Wesley Heights Citizen Ass'n v. District of Columbia Zoning Comm'n*, 856 A.2d 1174 (D.C. 2004) (reviewing AU's 2000 Campus Plan); *Glenbrook Rd. Ass'n v. D.C. Bd. of Zoning Adjustment*, 605 A.2d 22, 26 (D.C. 1992) (reviewing AU's 1989 Campus Plan).

[3]   11 DCMR § 3035.1.  *See George Washington Univ. v. District of Columbia Bd. of Zoning Adjustment*, 831 A.2d 921, 928-29 (D.C. 2003) ("In the areas where university use is by special exception, the owner must secure permission for specific university projects in a two-stage application process.  In the first stage, the university submits a 'campus plan' that describes its general intentions for new land use over a substantial period . . . .  In the second stage, the [zoning authority] reviews individual projects that the university proposes to undertake, evaluating them both for consistency with the campus plan and the zoning regulations.") (citation omitted).

approving AU's Campus Plan for the current decade and further processing applications for campus development and dormitory construction. Petitioners, two neighborhood associations that participated in the proceedings before the Commission, claim that it erred in sanctioning AU's plans. In Appeal No. 12-AA-723, we are persuaded that certain material determinations in the order in Zoning Commission Case No. 11-07 approving AU's Campus Plan and certain further processing applications are inadequately explained. Accordingly, we grant the petition for review in No. 12-AA-723 and remand for the Commission to address these particular deficiencies. In Appeal No. 12-AA-724, however, we uphold the Commission's order (Z.C. Case No. 11-07A) granting AU's further processing application for the construction of a student residence building known as North Hall.

## I. Background

AU has two campuses plus a law school in northwest Washington, D.C. The Main Campus is on a seventy-six acre plot of land at Ward Circle, where Nebraska and Massachusetts Avenues intersect. To the east, approximately a mile away, the eight-acre Tenley Campus is at Tenley Circle, where Nebraska Avenue intersects with Wisconsin Avenue. And the Washington College of Law (AU's law school)

is in a building on Massachusetts Avenue several blocks north of the Main Campus. In the 2011 Campus Plan that AU submitted to the Zoning Commission, AU sought approval of an increase in its student enrollment cap and a variety of changes and improvements, including three proposed developments related to the proposed increase in student enrollment that are central to the present appeal.

First, AU sought permission to relocate the Washington College of Law to the Tenley Campus in 2015. Second, AU asked the Commission to approve its plan to construct three new student residence halls and three academic buildings on what is now a University parking lot on Nebraska Avenue at the edge of the Main Campus, transforming it into what is to be called the East Campus. Third, AU also requested approval to construct a new dormitory building to be called North Hall at the northwest end of the Main Campus on Massachusetts Avenue. Petitioners' objections before us in this appeal relate primarily to AU's student enrollment and these three projects.

AU submitted its proposed Campus Plan to the Zoning Commission, together with further processing applications for the East Campus, North Hall, and other projects not involved in this appeal, in March 2011. The Commission held hearings on AU's proposals from June to November 2011. It received written

submissions and heard testimony from AU officials; Advisory Neighborhood Commissions ("ANCs") 3D, 3E, and 3F;[4] the D.C. Office of Planning and the District's Department of Transportation;[5] and several neighborhood groups and one individual that were granted party status, including petitioners Spring Valley-Wesley Heights Citizens Association ("SVWHCA") and Westover Place Homes Corporation ("Westover Place"). During the pendency of the proceedings before the Commission, AU made numerous modifications to its proposals in response to the concerns and objections of these other parties. Ultimately, after requesting and receiving further submissions, the Zoning Commission voted 4-0 to approve the 2011 Campus Plan and the North Hall further processing application, subject to various conditions, and it issued the orders that we now are asked to review.

## II. Discussion

The Zoning Commission was charged in this case with evaluating AU's Campus Plan as a whole and making a reasonable forecast as to whether its

---

[4] ANCs are automatically granted party status in zoning hearings pursuant to D.C. Code § 1-309.10 (a), (c)(1), (4) (2013 Repl.).

[5] Pursuant to regulation, the Office of Planning and the Department of Transportation must be given the opportunity to review university zoning applications filed with the Commission. 11 DMCR § 210.9 (2013).

implementation will lead to conditions "objectionable to neighboring property because of noise, traffic, number of students," or other factors.[6] The appropriate test to employ, we have said, is "whether the proposed use would significantly increase objectionable qualities over their current levels in the area."[7] In approving a campus plan and its implementation, the Commission may impose reasonable restrictions to minimize any adverse impacts on the neighborhood, having "due regard for the [u]niversity's needs and prerogatives."[8] Ultimately, the Commission's task is to achieve a "reasonable accommodation . . . between the University and the neighbors"—an accommodation that does not substantially "interfere with the legitimate interests of the latter."[9]

Our review of the Commission's orders is limited to determining whether the decisions are arbitrary, capricious, or otherwise not in accordance with law. "Absent a material procedural impropriety or error of law, the Commission's decision stands so long as it rationally flows from findings of fact supported by

---

[6] *Spring Valley*, 856 A.2d at 1176 (quoting 11 DCMR § 210.2).

[7] *Glenbrook Rd.*, 605 A.2d at 34.

[8] *Spring Valley*, 856 A.2d at 1176.

[9] *Glenbrook Rd.*, 605 A.2d at 32.

substantial evidence in the record as a whole."[10] Consequently, the Commission must explain its decision by making supportive findings of fact on "all material contested issues."[11] Generally speaking, if we can discern "with reasonable clarity" the "reasons for the decision," the agency has fulfilled its duty of explanation.[12] However, because the Commission is obligated by statute to give "great weight" to the issues and concerns raised in the recommendations of Advisory Neighborhood Commissions[13] and the Office of Planning,[14] we must ensure that the Commission has specifically acknowledged and addressed the positions of those bodies and provided a reasonably precise explanation for any disagreements with them.[15]

---

[10] *Spring Valley*, 856 A.2d at 1177 (internal quotation marks omitted).

[11] *Citizens Ass'n of Georgetown, Inc. v. District of Columbia Zoning Comm'n*, 402 A.2d 36, 52 (D.C. 1979); *see also D.C. Appleseed Ctr. for Law and Justice v. District of Columbia Dep't of Ins., Sec., and Banking*, 54 A.3d 1188, 1216 (D.C. 2012) ("The requirement that the decision be fully and clearly explained . . . is necessary for meaningful judicial review of and deference to the agency's decision.").

[12] *Dietrich v. District of Columbia Bd. of Zoning Adjustment*, 293 A.2d 470, 472-73 (D.C. 1972).

[13] D.C. Code § 1-309.10 (d)(3)(A)-(B) (2012 Repl.).

[14] D.C. Code § 6-623.04 (2012 Repl.).

[15] *See Spring Valley*, 856 A.2d at 1176, 1180-81; *Glenbrook Rd.*, 605 A.2d 22, 34 (D.C. 1992); *see also* D.C. Code § 1-309.10 (3)(B) (requiring agency to

*(continued…)*

Petitioners argue that the Commission did not properly discharge its duties in various respects, to which we now turn.

## A. Cap on Student Enrollment

When the Zoning Commission approved AU's last campus plan (the "2000 Campus Plan"), it did so on the condition that on-campus enrollment would not exceed 10,600 students.[16] AU's law students were not counted in this figure because the law school was located off-campus. AU was in compliance with the cap when it submitted its proposed 2011 Campus Plan to the Commission; at that time, it had enrolled a total of 12,068 students for the 2011-12 academic year— 10,298 undergraduate and graduate students (who were subject to the cap) plus

_____

*(continued…)*
"articulate with particularity and precision the reasons why the [Advisory Neighborhood] Commission does or does not offer persuasive advice under the circumstances," to make "specific findings and conclusions with respect to each issue and concern raised by the Commission," and to "support its position on the record").

[16] *See Spring Valley*, 856 A.2d at 1177. As a rule, it should be noted, we have said that "the imposition . . . of an enrollment cap at least approaches (if, indeed, it does not cross) the line between the exercise of legitimate zoning and land use authority and an *ultra vires* intrusion upon the University's educational mission." *President & Dirs. of Georgetown Coll. v. District of Columbia Bd. of Zoning Adjustment*, 837 A.2d 58, 74-75 (D.C. 2003) (footnote omitted). A freeze or cap on enrollment must be justified by "reasonably detailed" findings supporting the need for it. *Id.* at 75.

1,770 law students (who were not subject to the cap). In the 2011 Campus Plan, AU proposed that total student enrollment be capped at 13,600 students. Petitioners and the Advisory Neighborhood Commissions expressed concerns about an increase in the enrollment cap and sought to limit it, but the Commission approved AU's request, finding, *inter alia*, that the projected growth represented only a "relatively small," 13% increase in the total student population—from 12,068 to 13,600. The Commission concluded, however, that a separate cap on the number of law students would be appropriate in light of the relocation of the Washington College of Law to the Tenley Campus in 2015. Accordingly, as a condition of its approval of the 2011 Campus Plan, the Commission ordered that enrollment of law students at the Tenley Campus not exceed 2,000, a figure included within the overall cap of 13,600 students.

### 1. Magnitude of the Enrollment Cap Increase

On appeal, petitioners claim that the Commission misapprehended and underestimated the significance of raising the enrollment cap to 13,600 students when it characterized this as only a 13% increase in the total student population. With the law school relocation, petitioners argue, the new cap will permit a much greater increase in the number of students living and studying *on campus*—the area

that is of concern to the surrounding community. Because the Commission disregarded this fact, petitioners contend that its decision to permit the student population to grow to 13,600 was arbitrary and capricious.

We think there is merit to petitioners' claim. Factoring in the law school's move to Tenley Circle, AU sought permission to increase the ceiling on the number of students attending the University *on campus* from 10,600 to 13,600 students. That is an increase of not 13%, but of over 28%.[17] The Commission did not acknowledge, and it appeared not to appreciate, that the projected increase in on-campus enrollment was of this magnitude, and thus it did not adequately confront petitioners' fundamental concern that an influx of as many as 3,000 additional students *in the campus area* would cause objectionable conditions for neighboring properties. On remand, the Commission must address this concern.

Beyond that threshold, petitioners argue that the Commission erred in addressing two specific concerns about the off-campus impact of an increase in student enrollment. These concerns related to the expanded presence of AU and the behavior of AU students in the surrounding community.

---

[17] *Cf. Spring Valley*, 856 A.2d at 1177 (comparing the maximum numbers of students allowed on the Main and Tenley Campuses in the old and new plans).

**2. Expansion into the Community and Displacement of Local Businesses**

As to the first of those impacts, petitioners and ANC 3D argued that lower enrollment caps were needed to limit AU's expansion and purchase of private property off campus, which they feared would result in the loss of neighborhood businesses (particularly small retail businesses serving the local community, such as neighborhood food stores[18]). They urged the Commission to consider the effects of such expansion into the surrounding neighborhood as an objectionable condition arising from the size of the University permitted under its campus plan, and therefore to be a proper subject of a conditional approval. The Commission, however, declined to address this issue on its merits, stating that AU's "use of off-campus property" was "beyond the scope of this proceeding." Petitioners now argue that the Commission misapprehended its legal authority and that displacement of local business threatened by a proposed campus growth plan is a cognizable objectionable condition that the Commission should have considered.

---

[18] As an example, SVWHCA cited AU's conversion and division of a neighborhood grocery store into a mail-sorting facility and a pizza restaurant aimed at students rather than neighborhood residents.

We express no view as to whether petitioners' concerns about AU's expansion into the surrounding neighborhood might call for the imposition of a lower cap on student enrollment or other restrictions on AU's campus development plans. But we agree with petitioners that the Commission should have addressed that issue on its merits.

It is true that the requirement of special exception approval for campus development "does not restrict a university from owning and using property beyond the campus borders, so long as that use is consistent with the applicable zoning restrictions for that site."[19] The permissibility of off-campus development does not depend on whether a university or a private party owns the property; "zoning controls use, not ownership."[20] Here, however, the question the Commission was asked to consider was not AU's right to acquire and use property off campus for University purposes, but only whether such expansion attributable to AU's proposed on-campus growth would lead to objectionable conditions for the surrounding community. We have recognized that "resident displacement"

---

[19] *Watergate West, Inc. v. District of Columbia Bd. of Zoning Adjustment*, 815 A.2d 762, 767 (D.C. 2003). For example, in a Commercial District, university uses are permitted as a matter of right. 11 DCMR § 701.6 (b).

[20] *Watergate West*, 815 A.2d at 767 (internal quotation marks omitted).

from a university's "expanded presence" in the vicinity of its campus can, in principle, constitute an objectionable condition justifying the Commission's imposition on a campus development plan of "reasonable measures . . . to stem the tide."[21]

It is conceivable that AU's expansion and acquisition of property in the neighborhood of its campuses could become an objectionable condition, and that limiting student enrollment might be a reasonable measure to prevent that from happening. Because this issue was raised by an ANC, the Commission should have addressed it substantively and with appropriate particularity in deciding whether to approve AU's request to raise its cap on student enrollment. The Commission should do so on remand.

### 3. Student Behavior Off Campus

Another concern relating to the size of the AU student population raised by the ANCs and others was off-campus student behavior and the adequacy of AU's efforts to limit it. Neighbors complained of off-campus undergraduate residences

---

[21] *George Wash. Univ. v. District Columbia Bd. of Zoning Adjustment*, 831 A.2d 921, 933 (D.C. 2003).

that generated persistent problems of excessive noise and trash, as well as other student conduct having a disruptive impact on the surrounding community, such as underage drinking and noisy late-night social activities. AU reported that "from six to ten 'problem addresses' [off-campus student housing] emerge each year" and "require intervention" by the University.

The Commission found that AU oversees off-campus student residences and actively communicates its expectations for student conduct in the community. AU had implemented a number of measures since the approval of its 2000 Campus Plan to manage and deter off-campus student misconduct. These measures included a recent amendment of the student code of conduct to allow the University to bring charges against students for off-campus misbehavior; improved procedures and commitment of resources and personnel to receive, track, and respond to neighbors' complaints and intervene effectively; improved collaboration with the police; and the establishment of relationships with landlords and realtors.

The sufficiency of AU's efforts to prevent off-campus student behavior from becoming an objectionable condition was contested. ANC 3D charged that there were "unprecedented problems stemming from students' behavior off-campus,"

that AU officials had not been "vigilant" in responding to the concerns of neighborhood residents, and that the University's action plan had been "ineffective and inadequate in protecting the neighborhood from disruptive student behavior off campus." Similarly, ANC 3E stated that it believed the University was "unable or unwilling" to address these problems, and Westover Place asserted that AU had "failed to recognize or solve these issues in a meaningful or adequate manner."

The Commission acknowledged the foregoing concerns and noted that it was "sympathetic" to the neighbors who had described "serious issues that have arisen in the past due to student misconduct." Ultimately, however, the Commission did "not find a systemic problem of objectionable conditions related to student conduct," and it was satisfied that "the University's measures are appropriate to address student behavior consistent with the scope of the Zoning Regulations. Citing, in particular, AU's amendment of its student code of conduct "to enhance its effectiveness against misbehavior occurring off campus," the Commission concluded that the 2011 Campus Plan was not likely to create objectionable conditions related to student misbehavior. Petitioners object to this determination, arguing that it is not based on substantial evidence and that the Commission improperly shifted the burden of proof to AU's opponents.

We disagree. The evidence allowed the Commission to conclude that only a small proportion of students and off-campus properties had caused problems, and that AU had made effective enhancements to its enforcement mechanisms to address those problems. Even ANC 3E acknowledged that "most students living off-campus are good neighbors, [but] there seem to be about 6 to 10 houses per year that create chronic disturbances." Further, the Commission was entitled to credit AU's representations that it would in good faith continue to improve its strategies to control student conduct. Nor did the Commission improperly require the neighborhood representatives to prove there *would* be objectionable conditions instead of requiring AU to show that such conditions are *not* likely to arise. Without shifting any burden, the Commission reasonably could find that given the small proportion of students and off-campus properties generating complaints, and AU's redoubled efforts to curtail them, the anticipated increase in student enrollment is not likely to give rise to objectionable conditions.

## B.  On-Campus Housing

As a condition of its approval of AU's 2000 Campus Plan, the Commission required the University to make on-campus housing available for two-thirds of its full-time undergraduates and 85% of its full-time freshmen and sophomores. At

the time of the hearings on the proposed 2011 Campus Plan, AU's on-campus residence halls accommodated approximately 3,749 students. Even so, AU still did not have enough existing on-campus housing to fulfill the requirement that it make such housing available to two-thirds of its undergraduates.[22] Moreover, some of the students living in on-campus housing were not undergraduates.

In its 2011 Campus Plan, AU proposed to discontinue a 497-bed dormitory located on the Tenley Campus while adding sufficient student housing on the Main Campus for 1,300 students (resulting in a net increase of 803 beds on campus). AU envisioned the increase in beds to be achieved in three phases of construction. In the first phase, 510 beds would become available at the new North Hall and an addition to Nebraska Hall (an existing dormitory) by the fall of 2013. Because of the simultaneous loss of student housing on the Tenley Campus, the result at this point in time would be a net increase of only 13 beds. In the second phase, however, another 590 beds would become available on campus by the fall 2016 semester with the opening of three new student residences on the planned East Campus. The addition of these beds would enable AU to achieve its goal of

---

[22] The reason AU did not achieve this housing goal is not entirely clear to us from the record, but it appears to be related to the fact that undergraduate enrollment exceeded the University's projections.

making on-campus housing available to 67% (i.e., two-thirds) of its undergraduates. The University also committed to make on-campus housing available for 100% of its freshmen and sophomores by the fall of 2016. Finally, in the third phase, a new 200-bed dormitory known as South Hall would be constructed adjacent to an existing dormitory complex on the Main Campus. AU did not have a timetable for this project, however.

The Office of Planning generally agreed with AU's residential construction proposal. It specifically recommended retention of the condition requiring AU to make on-campus housing available for 67% of its undergraduates (at least by 2016), but with the added requirement that the housing provided to satisfy this availability condition actually be reserved for undergraduate use exclusively. Along with the ANCs, which supported comparable conditions, the Office of Planning emphasized that AU was not yet in compliance with the undergraduate housing availability condition of the 2000 Campus Plan, and ANC 3D recommended freezing enrollment until the on-campus housing capacity was built so as to ensure that AU could handle any increase in student enrollment. AU opposed the latter recommendation and pointed out that the 67% housing requirement would effectively limit its ability to increase undergraduate enrollment. ANC 3D also called for the new student housing to be located at the

core of the campus to avoid objectionable conditions for neighbors bordering the University. Westover Place, representing many of such neighbors, voiced the same request.

The Commission concluded that AU's student housing program was "an important means of limiting the potential for objectionable conditions related to the number of students." It found that "the University [currently] was providing on campus housing for 59% of its full-time undergraduate population," and that under its proposed Campus Plan it would "maintain a supply of housing sufficient to make on campus housing available" for 100% of the freshmen and sophomores and for 67% of all undergraduates beginning with the opening of East Campus in the fall of 2016. In the interim, the Commission required AU to "continue to make on campus housing available to" 85% of freshmen and sophomores and 59% of all undergraduates. Because the Commission agreed with AU that "the 67% housing requirement effectively serves as a cap on undergraduate enrollment," it declined to follow ANC 3D's recommendation for an enrollment freeze pending AU's fulfillment of that condition.

**1. The Availability of Undergraduate Housing on Campus**

Petitioners assert that the Commission erred in basing its decision on a factual finding that AU "was providing on campus housing for 59% of its full-time undergraduate population." This finding was incorrect, they argue, because the testimony and other evidence at the hearing established that AU does not use all of its dormitory capacity for undergraduates and that non-undergraduates reside in some of the campus space. In actuality, AU houses only 55% of its undergraduates on campus. These facts appear to be undisputed. The error, petitioners argue, is material and renders the Commission's decision arbitrary and capricious.

We are not persuaded by this contention. The Commission was not under any misimpression as to AU's on-campus housing. The Commission's order makes clear that it was addressing not *actual* usage but *capacity*. In its conclusions and in the conditions it imposed, the Commission consistently spoke in terms of AU's duty to maintain a supply of housing sufficient to make on-campus living "available" to the specified percentages (59% until 2016, 67% thereafter) of undergraduate students. As this represented a continuation of the availability condition imposed on AU when its prior Campus Plan was approved, availability rather than actual usage was the pertinent question. And it appears AU *did* have dormitory space on campus for 59% of its undergraduates, even though fewer than 59% took advantage of it.

On the other hand, we agree with petitioners that the Commission neglected to address the specific recommendation of the Office of Planning that AU actually devote its on-campus housing to the specified percentages of undergraduates. Clearly the Commission did not require that any particular proportion of undergraduates *must* live on campus, and it may have had good reasons to refrain from doing so.[23] But the Commission did not provide those reasons or focus on the disparity between the number of student beds available on campus and the extent to which those beds actually are allocated to undergraduates. Indeed, it remains unclear how the Commission envisions the undergraduate housing availability requirement to work: for instance, whether AU must make housing available to undergraduates *first* and then may assign other students to whatever unfilled space remains.[24] Because the Commission did not "provide a reasoned basis for any disagreement" with the Office of Planning recommendation that the on-campus

---

[23] AU does not currently *require* any student to live on campus. We express no view as to whether it would be impermissibly intrusive into the "details and mechanics" of running a university for the Commission to require a specified percentage of undergraduates to reside in on-campus housing. *See President & Dirs. of Georgetown Coll. v. District of Columbia Bd. of Zoning Adjustment*, 837 A.2d 58, 77 (D.C. 2003).

[24] The Commission heard testimony that there was unmet demand for undergraduate housing on campus and that the risk of the new residence halls becoming filled with non-undergraduate students is therefore low. Yet in reality, non-undergraduates fill a significant number of on-campus beds. How this could

*(continued…)*

housing (or a specified portion of it) be occupied solely by undergraduates, it must rectify this omission by addressing the recommendation on remand.[25]

## 2. The Housing Requirement as a *De Facto* Freeze of Undergraduate Enrollment

Petitioners take issue with the Commission's decision not to freeze student enrollment pending the provision of additional on-campus housing for two-thirds of AU's undergraduates. Petitioners argue that the Commission acted arbitrarily and capriciously in trusting AU to adhere to an undergraduate housing availability condition it had violated in the past and has yet to fulfill. We confronted a similar argument when we reviewed the Commission's approval of AU's 2000 Campus Plan. In that case, although the Commission agreed that University-related off-campus parking had been a persisting problem despite AU's ameliorative efforts, it was satisfied to require AU to continue to use its "best efforts" to address the problem.[26] We rejected the contention that the Commission erred under the

---

*(continued…)*
occur if AU has been making on-campus housing available to two-thirds of its undergraduates would seem to call for some elucidation.

[25] *Glenbrook Rd.*, 605 A.2d at 34 (D.C. 1992).

[26] *Spring Valley*, 856 A.2d at 1178-79 (D.C. 2004).

circumstances because the "best efforts" requirement was unduly permissive. We concluded instead that it was "entirely reasonable for the Commission to state a general condition and to leave 'the details and mechanics' of its enforcement to the University."[27]

The circumstances under consideration are not entirely comparable, however. When the Commission approved AU's 2000 Campus Plan, it imposed a specific requirement that housing be made available on campus for two-thirds of the University's undergraduates to mitigate the impact on the community of anticipated increases in enrollment (up to an approved cap). There had been no similarly specific, pre-existing requirement applicable to off-campus parking when the Commission decided to trust AU to continue using its "best efforts" to address the problem.

While AU's past failure or inability to fulfill the undergraduate housing availability requirement is troubling, the Commission has discretion to continue to trust that the University will timely comply with the on-campus housing requirement if, after due consideration of the arguments presented, the

---

[27] *Id.* at 1180.

Commission decides that the evidence, including the University's noncompliance under the 2000 Plan, does not warrant imposition of an enrollment freeze. We recognize that approval of a campus plan is primarily a prospective exercise; it should not, ordinarily, take on a punitive character. "[S]ome flexibility" is needed for campus plans, inasmuch as university officials cannot be expected to "predict with specificity" the campus's future circumstances and development.[28] Moreover, AU has "ample incentive"[29] to comply with the enrollment and housing conditions imposed by the Commission so as not to jeopardize its further processing applications for future campus development projects envisioned in the 2011 Campus Plan,[30] and to avoid the imposition of other penalties.[31] We note that in

---

[28] *Georgetown Residents Alliance v. District of Columbia Bd. of Zoning Adjustment*, 816 A.2d 41, 49 (D.C. 2003).

[29] *Spring Valley*, 856 A.2d at 1179.

[30] In addition to the projects discussed in this opinion (the relocation of the law school, the East Campus, and North Hall), the 2011 Campus Plan proposes a number of other new projects that apparently will require further processing in the future, including the construction of South Hall; the expansion of the chemistry building (the "Beeghly Addition"); additions to the Multipurpose Gymnasium; replacement of the Sports Center Annex; the installation of new bleachers at Reeves Field; an addition to the Kay Spiritual Life Center; and the enclosure of the Butler Tunnel under the Sports Center Garage.

[31] The Commission's order further states that

> No special exception application filed by the University
> for further processing under this plan may be granted

*(continued…)*

approving the Campus Plan, the Commission required the University to submit an updated report on "the supply of on-campus housing and the number of full-time undergraduate students" with any future construction request.

Even so, we think that the Commission's rejection of the ANC's "enrollment freeze" recommendation calls for more explanation than the Commission has provided in its order. AU did not adequately account for its inability to comply with the housing requirement of its 2000 Campus Plan, but as previously noted, the reason appears to be related to the fact that undergraduate enrollment exceeded the University's projections. If that is so, AU's argument against a freeze on enrollment—that it would be unnecessary because the on-campus housing requirement will operate automatically to keep a lid on the undergraduate student population—is less than wholly persuasive. In light of this record and

*(continued…)*

> unless the University proves that it has consistently remained in substantial compliance with the conditions set forth in this Order. Any violation of a condition of this Order shall be grounds for the denial or revocation of any building permit or certificate of occupancy applied for by, or issued to, the University for any University building or use approved under this plan, and may result in the imposition of fines and penalties pursuant to the Department of Consumer and Regulatory Affairs Civil Infractions Act of 1985, D.C. Official Code §§ 2-1801.01 to 2-1803.03 (2001).

notwithstanding AU's incentives to comply with the enrollment and housing conditions on the approval of its current Campus Plan, we conclude that on remand the Commission should give further consideration to the concerns regarding AU's past noncompliance raised by the ANC, the Office of Planning, and others, and explain more fully why it does or does not agree with the recommendation for a temporary freeze on undergraduate enrollment pending the availability of on-campus housing for two-thirds of the University's undergraduates.

## C. East Campus

The eight-acre East Campus project proposed in AU's 2011 Campus Plan and further processing application is intended to transform what is currently an underutilized outdoor parking lot located across Nebraska Avenue from the Main Campus and adjacent to the Westover Place townhome community on its east side. Six new buildings are contemplated for the East Campus: three devoted to academic and administrative uses, and three dormitories that will house 590 undergraduates (excluding freshmen). A number of features of the East Campus project are intended to mitigate adverse impacts on the nearby residents of Westover Place. In particular, the three dormitories will be situated at least 100 feet from the property line with Westover Place and oriented so that no dormitory

windows face in that direction.[32]   Two of the academic/administrative buildings will be placed between Westover Place and the dormitories, so as to block noise from the dorms and activities in two courtyards in the center of the East Campus. These so-called "buffer buildings" will be about 34 feet high, roughly the same height as the Westover Place townhouses.  To reduce noise and other adverse impacts on the neighbors, the buffer buildings will not have entrances, balconies, or terraces facing Westover Place.   AU also proposes to create a buffer zone between the buildings and Westover Place consisting of a landscaped berm and other plantings.  This buffer zone is to be 55 to 60 feet deep, except for a 40-foot wide "pinch area" in front of a small open area reserved for parking.

In support of its assertion that the East Campus development would not create objectionable conditions relating to noise for the residents of Westover Place, AU submitted a study prepared by an acoustics expert.  The study concluded that noise from the East Campus ordinarily would be within the limits prescribed by the District's noise ordinances and would not disturb neighboring residences. AU and its expert acknowledged the possibility that the production of loud noise

---

[32]   The tallest of the three dorms, with a height of 62 feet, will be located along Nebraska Avenue at least 300 feet from Westover Place.  The other two dorms will each be 54 feet tall and will be over 100 feet away from the property line.

(e.g, "party" music) in dormitory rooms with their windows open could disturb some neighborhood residents, depending on their location, but University staff in the dorms would be responsible for controlling this.[33] Like all of AU's student residence halls, each East Campus dormitory is to have a resident assistant on each floor along with a resident director and desk receptionist, and each will be subject to residence hall regulations that prohibit disorderly conduct and specified activities. In addition, AU committed not to permit outdoor sound amplification on the East Campus.

To safely accommodate the increased pedestrian traffic between the East Campus and the Main Campus, AU proposed the installation of an additional crosswalk with a traffic signal across Nebraska Avenue in the middle of the block. An analysis by AU's traffic expert concluded that the signal was warranted and would facilitate pedestrian traffic without causing unacceptable delays. The Department of Transportation agreed with AU that the proposed mid-block signal was warranted and would alleviate safety and traffic concerns, "in part because the pedestrian crossings would be spread over three intersections" on the block. The

---

[33] With closed windows, AU's expert concluded, there would be no noise problem.

Department anticipated working with AU on signal timing to ensure that the addition signal would have "minimal to no effect on traffic."

The Office of Planning supported the East Campus project with several caveats. To reduce the density of student housing on the site, the Office recommended limiting the East Campus dormitories to 400 beds. In addition, it recommended that the dormitories be built at least 125 feet from the Westover Place property line and that the buffer zone be at least 65 feet wide and fenced to prevent recreational use of the zone by students. ANC 3D and petitioners opposed the East Campus project, arguing on multiple grounds that despite the preventive and ameliorative measures, the development would be objectionable to neighboring property because of its density, the number of students expected to reside there, and the size of its buildings compared to the townhouses in Westover Place. They argued that the "buffer" plans were inadequate to shield Westover Place from noise generated on the East Campus and other adverse impacts; that the development would worsen traffic congestion and endanger public safety; and that measures were needed to prevent AU students from taking over the recreational playground space at the nearby Horace Mann Elementary School to the detriment of community residents. ANC 3D also offered a variety of recommendations to limit or control the use of the East Campus, such as a condition that meeting space

should either be eliminated or located underground, and a proposal that outdoor recreational space be set aside on the East Campus for student residents.[34]

The Commission ultimately concluded that the East Campus site was appropriate for the development that AU proposed. The East Campus, the Commission stated, will not be "out of character with its surroundings," as the site is just across Nebraska Avenue from the largest part of AU's Main Campus and near several other institutional uses also fronting on Nebraska Avenue. Furthermore, the Commission noted, "[t]he abutting lower-density residential community, Westover Place, already borders some high-density developments," i.e., large apartment buildings along Massachusetts Avenue on the south and east. The Commission found that the East Campus project

> is not likely to create objectionable conditions or
> adversely affect the use of neighboring property,
> considering especially the site design, including the
> location and design of the "buffer buildings"; elements of
> building design, such as the location of entrances and the
> absence of balconies; the number of student beds in the

---

[34] ANC 3E, on the other hand, viewed the East Campus as "an appropriate site for development, including student housing on the order AU is proposing." It noted that other alternatives equally "faced resistance" from the community. The ANC believed that AU had proposed "an adequate buffer" to protect Westover Place residents from objectionable conditions, and that traffic and pedestrian issues were manageable.

> residential buildings, where students will be subject to the University's residence hall regulations, code of conduct, and other rules governing student behavior; and the provision of a large landscaped buffer between the East Campus and the abutting residences.

In addition, the Commission agreed with AU and the Department of Transportation that "the mid-block pedestrian signal will provide a safe means for pedestrians to cross Nebraska Avenue without creating adverse impacts for vehicular traffic." Thus, the Commission stated, it was "not persuaded" by ANC 3D and the other opponents that the East Campus development is likely to result in objectionable conditions relating to "noise, density of development, student conduct, risks to pedestrians, visual impacts, or other potential adverse impacts," or that the additional measures recommended by ANC 3D were "necessary or warranted."

On appeal, petitioners put forward a bevy of challenges to the Commission's approval of the East Campus development. They argue that the Commission failed to accord great weight to the issues and concerns of ANC 3D and the Office of Planning, and that its conclusions lack support. For the most part, we are not persuaded.

## 1. Density and Scale of the East Campus

To begin with, petitioners contend that the Commission did not address adequately the concerns about the proposed density and scale of development on the East Campus. On the contrary, the Commission acknowledged the ANC and Office of Planning recommendations that the density be lowered (e.g., that the planned number of student beds be reduced), and it explained with reasonable particularity its conclusion that the high density of the East Campus as proposed by AU would not result in objectionable conditions for neighboring properties. We do not agree with petitioners' complaint that the Commission failed to consider the availability of alternative locations for student housing to further reduce the density of the East Campus, as was urged by the Office of Planning, ANC 3D, and petitioners.[35] It was not the function of the Commission to consider all the possible alternatives to development of the East Campus; its only task was to evaluate whether "the *proposed* site will become objectionable to neighboring properties."[36] Similarly, AU was "not charged with considering every option that any party in

---

[35] Relatedly, petitioners assert that the Commission "erroneously permitted" AU to "refuse[] to explore alternatives." But in developing its Campus Plan, AU had investigated alternative locations to meet its housing needs.

[36] *Glenbrook Rd.*, 605 A.2d at 32 (citing 11 DMCR § 210).

opposition might conceptualize."[37]   In point of fact, moreover, the Office of Planning and ANC 3D did not provide detailed alternative proposals; they merely asserted the desirability of locating more student housing at the "core" or "center" of the University campus without working through all the practical questions that their preferred alternative would raise.   And while Westover Place and another neighborhood group proffered a private consultant's "alternative framework" for more intense residential development in the campus core, the Commission *did* consider that proposal and found it flawed.[38]   Its decision was amply supported by the record and therefore not arbitrary or capricious.[39]

---

[37]   *Id.* (quoting *Don't Tear It Down, Inc. v. District of Columbia Dep't of Hous. & Cmty. Dev't*, 428 A.2d 369, 379 (D.C. 1981)).

[38]   The Commission explained that the "alternative framework" supported by Westover Place and another neighborhood group "did not take into account important factors such as financial feasibility, the need for changes to roads and infrastructure, the current use of some of the sites identified as potential locations for new student residences, or the University's program requirements, and did not consider the East Campus as an appropriate site for student housing."

[39]   Petitioners also object that the Commission found that Westover Place "already borders some high-density developments" without making detailed factual findings about the characteristics of those nearby developments.  We do not agree that detailed factual findings respecting the apartment buildings next to Westover Place were necessary to support the Commission's determination that the proposed East Campus would not be out of character with its surroundings.  In evaluating whether the proposed East Campus would be likely to lead to objectionable conditions, the Commission properly considered the overall character of the neighborhood; but for the purposes of this proceeding, it reasonably could do so in general terms without describing and analyzing the

*(continued…)*

## 2. Pedestrian Safety

Petitioners challenge the Commission's conclusion that the East Campus development would not produce hazardous conditions for pedestrians. They argue that the Commission ignored evidence and failed to accord great weight to ANC 3D's concerns and recommendations.

ANC 3D charged that the East Campus development, even with the addition of a mid-block pedestrian traffic signal on Nebraska Avenue, would increase congestion and exacerbate unsafe conditions around the Main Campus created by the already heavy vehicular and pedestrian traffic in the area. The ANC emphasized that pedestrians often cross the street against the light, decreasing the effectiveness of additional traffic signals. From other sources, though, including the Department of Transportation, the Commission heard experts opine that, while AU could not control pedestrian behavior, the proposed new signaled crossing and

_(continued…)_
characteristics of every building in the vicinity of Westover Place. We have no doubt that the Commission appreciated that the proposed East Campus development would not be _identical_ to the other high density developments around Westover Place. That fact does not invalidate its conclusion.

other traffic control measures would influence it positively and thus "improve safety."

We do not think the Commission ignored any evidence or recommendations. The Commission heard ANC 3D's concern that there would be an increased safety risk, and it heard evidence pro and con about the effectiveness of safety measures, including the installation of a mid-block traffic light and crosswalk to reduce jaywalking. The Commission credited the University's evidence and the opinion of the Department of Transportation and, based on that evidence, concluded that AU's proposed measures would be sufficient to reduce risks to pedestrians such that there would be no likely objectionable conditions. We see nothing more the Commission needed to do to explain its conclusion or to address the ANC's concerns.

### 3. Noise

In concluding that the East Campus would not give rise to objectionable noise conditions for the residents of Westover Place, the Commission relied in part on an expert analysis submitted by AU. The analysis utilized measurements and modeling to predict expected noise from all floors of the student residence halls and some additional noise from the buffer buildings. The analysis showed, and the

Commission acknowledged, that while not *all* noise would be blocked by the buffer buildings, the expected volume even from unblocked paths of allowable noise would be at permissible levels. In addition, AU proffered, excessive noise production that could become objectionable (loud party noise, for example) would be prohibited by the student code of conduct and a ban on the use of sound amplification on the East Campus.

The opponents of AU's East Campus plans did not submit their own expert noise analysis to counter that of AU, but they did argue that AU's analysis was flawed in certain respects and failed to address all their key concerns. In this court, petitioners contend that the Commission ignored evidence and argument that nearby residents of Westover Place might not be adequately protected from excessive noise generated on the East Campus by the measures AU identified. To the extent petitioners are merely reiterating their concern that some noise coming from the upper floors of the residence halls would not be blocked by the shorter "buffer" buildings, we are not persuaded by their argument. The Commission considered and addressed this concern, and it relied on substantial evidence in finding that the unblocked noise would not likely become objectionable.

However, petitioners, with the support of ANC 3D and the Office of Planning, also pointed to two specific respects in which, it was claimed, AU's analysis fell short: (1) the study did not assess how anticipated noise from the East Campus buildings would compare with background noise levels at night (when an increase in noise might be most objectionable to neighbors); and (2) the study allegedly failed to model or assess the impact of noise from activities and mechanical operations in the buffer buildings. Petitioners argue that the Commission's failure to address these alleged omissions requires that they be addressed on remand.

Given that the opposition to the East Campus development presented no evidence affirmatively demonstrating that an increase in nighttime noise or noise from the buffer buildings would be objectionable, it may be understandable that the Commission did not find it necessary to address those possibilities in making a reasonable forecast on the record before it that the development as a whole is unlikely to become objectionable because of noise. Even so, we cannot dismiss the concerns identified by petitioners, the ANC, and the Office of Planning on these particular points as fanciful or invalid, and so we are persuaded that the

Commission was obliged to "c[o]me to grips" with them.[40]    Because the Commission did not address these specific challenges to AU's evidence in its decision, we hold that it should do so on remand.

### 4. Horace Mann Playground

ANC 3D and Petitioners voiced the specific concern that East Campus students would interfere with community residents' enjoyment of the Horace Mann playground facility.  University officials testified that they would cooperate with Horace Mann Elementary School to alleviate this concern and make it sanctionable for AU students to use the recreational area.  However, the Commission did not specifically address the issue; it said only that it was "not persuaded" by ANC 3D that requiring AU to provide outdoor recreational space for students in the East Campus was "necessary or warranted."  While "great weight" does not mean the Commission must exhaustively discuss every detail in an ANC's submission, this was a fairly prominent concern that the Commission failed to address—a failure made all the more puzzling given the apparent solution offered by AU.  On

---

[40] *Neighbors Against Foxhall Gridlock v. D.C. Bd. of Zoning Adjustment*, 792 A.2d 246, 249 (D.C. 2002) (internal quotation marks omitted).

remand, the Commission must deal with this concern with the required particularity and precision.[41]

### 5. Landscaped and Fenced Buffer Zone

The Office of Planning and ANC 3D recommended that the Commission require AU to provide a landscaped buffer, at least 65 feet wide, between the East Campus and Westover Place to reduce light and noise impacts, with a fence to prevent students from using the buffer zone for recreational purposes. AU proposed a buffer 55-60 feet deep for most of its length, with one part only 40 feet deep to accommodate the remaining parking space; and its proposal did not include a fence. Petitioners argue that the Commission did not adequately explain why it accepted AU's buffer proposal without modification rather than that of the Office of Planning and ANC 3D.

In two respects, we agree. While the small difference between a depth of 55-60 feet and one of 65 feet does not call for additional explanation, the portion of AU's proposed buffer that would be only 40 feet wide does seem to constitute a relatively significant deviation from what the Office of Planning and the ANC

---

[41] *Spring Valley*, 856 A.2d at 1180.

sought, such that the Commission should have provided a "reasoned basis" for allowing it.[42] The Commission likewise should have addressed the recommendation for a fence to keep AU students out of the buffer zone. It should address both these matters on remand.

### D. Vehicular Traffic

The impact of AU's 2011 Campus Plan (including, but not limited to, the East Campus development) on vehicular traffic in the vicinity of the Main and Tenley Campuses was a contested issue in the proceedings before the Commission. The Commission received conflicting expert reports and opinions, which it summarized in its order. Gorove/Slade, the consulting company hired by AU to model the traffic impact of its Campus Plan, opined that the Plan would have minimal impact on the surrounding transportation network—no intersections would "reach unacceptable levels of delay"—given a long-term downward trend in the level of vehicular traffic in the area and the positive effects of AU's on-going Transportation Demand Management ("TDM") program.[43] The Department of

---

[42] *Glenbrook Rd.*, 605 A.2d at 34 (D.C. 1992).

[43] AU's TDM program employed a number of approaches to reduce vehicular traffic to and from campus, including a free shuttle service, carpooling

*(continued…)*

Transportation generally endorsed the Gorove/Slade methodology, assumptions, and projections, as well as AU's TDM strategies, and agreed that the Campus Plan would result in "minimal vehicular impacts." The Office of Planning, noting *inter alia* that the AU campus is adjacent to major arterial and connector streets and is well-served by public transit, was supportive of AU's TDM efforts. In contrast, ANC 3D and its consultant, Nelson/Nygaard, criticized Gorove/Slade's methodology and recommended that additional TDM measures be employed to avoid objectionable traffic conditions, notably including the imposition of a peak hour auto trip cap.[44] Petitioners too criticized the Gorove/Slade study, disputed AU's assertion that vehicular traffic to and from the Main Campus had been declining, and claimed that the impact of the 2011 Campus Plan on traffic would be greater than AU and Gorove/Slade had projected.

---

*(continued…)*
and ride-sharing plans, and inducements to use public transportation and bicycles. AU's transportation impact study credited the TDM program with having achieved a decade-long decline in vehicular traffic at the Main Campus of nearly 4% a year. As part of its 2011 Campus Plan, AU planned to institute enhancements to promote the TDM program and monitor its effectiveness.

[44] A trip cap is essentially an enforceable limit on the number of automobile trips that students and staff are allowed to make to and from campus. ANC 3D proposed that "any year where AU's population generates more than the approved maximum number of auto trips, AU should be required to further increase [its] TDM program and identify to the Zoning Commission and to the community how [it] intend[s] to reduce this number in the future."

The Commission stated that it found the Gorove/Slade methodology credible "notwithstanding the objections raised by the parties in opposition," and it concluded that approval of the 2011 Campus Plan is not likely to create objectionable conditions related to traffic. The Commission conditioned its approval on AU's continued implementation and improvement of its TDM program, saying that it was "not persuaded by ANC 3D's unsubstantiated claims that the TDM strategies would not be effective." The Commission declined to adopt the peak hour trip cap recommended by the ANC, noting that AU had "proposed an array of measures also designed to limit vehicular trips to the campus, as well as methods to monitor their effectiveness."

### 1. Crediting AU's Traffic Study

Petitioners argue that the Commission failed to explain why it credited Gorove/Slade despite the expert evidence to the contrary, and that it thereby failed to give great weight to ANC 3D's concerns. We agree that the Commission's explanation of its decision regarding the impact of the Campus Plan on vehicular traffic does leave something to be desired. The merits of the opposing experts' views were well-explored during the hearings before the Commission, and there

was "substantial evidence on both sides" of the dispute.[45] But the Commission's discussion of the diverging expert opinions on the traffic issue was quite cursory, and it was descriptive rather than evaluative. Other than noting that Gorove/Slade's methodology was "acceptable to" the Department of Transportation, the Commission did not explain *why* it found that methodology credible despite the criticisms leveled at it by the opposing parties' experts.

"An agency fails to base its decision on substantial evidence in the record when it ignores material evidence in the record."[46] Moreover, an administrative agency's failure to explain why it rejects conflicting evidence may impair appellate review, for in determining whether an agency decision is supported by substantial evidence, it is incumbent on the court to "take into account whatever in the record fairly detracts" from the weight of the evidence on which the agency relied.[47] The need for explanation is heightened where, as here, the subject matter is "technical

---

[45] *Johnson v. District of Columbia Office of Emp. Appeals*, 912 A.2d 1181, 1185 (D.C. 2006).

[46] *Darden v. District of Columbia Dep't of Empl. Servs.*, 911 A.2d 410, 416 (D.C. 2006).

[47] *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951).

and complex."[48]  And although we have said that, in general, the Commission "[a]s the trier of fact . . . may credit the evidence upon which it relies to the detriment of conflicting evidence, and need not explain why it favored the evidence on one side over that on the other,"[49] this must be balanced against its statutory duty to "elaborate, with precision, its response to the ANC issues and concerns, articulating why [the ANC] does or does not offer persuasive advice under the circumstances."[50]  For these reasons, we conclude that to fulfill its duty in this case, the Commission should have explained at least briefly, but with particularity, why it credited AU's study in light of, and despite, ANC 3D's substantial criticisms of it.[51]  On remand, the Commission should rectify this omission.[52]

---

[48] *D.C. Appleseed Ctr. for Law and Justice v. District of Columbia Dep't of Ins., Sec., and Banking*, 54 A.3d 1188, 1217 (D.C. 2012) ("The more technical and complex the subject matter, the more explanation the agency ought to provide for its decision.").

[49] *French v. District of Columbia Bd. of Zoning Adjustment*, 658 A.2d 1023, 1035 (D.C. 1995) (quoting *United Unions, Inc. v. District of Columbia Bd. of Zoning Adjustment*, 554 A.2d 313, 315-16 (D.C. 1989) (internal quotation marks omitted)).

[50] *Neighbors Against Foxhall Gridlock v. District of Columbia Bd. of Zoning Adjustment*, 792 A.2d 246, 249 (D.C. 2002) (internal quotation marks omitted).

[51] *Cf. id.*, 792 A.2d at 250 (noting with approval that the Board of Zoning Adjustment appropriately explained in "a lengthy portion of its opinion" why it was convinced by an expert opinion that was contrary to the position of the ANC).

## 2. Opportunity for Cross-Examination

It was discovered at a relatively late stage of the hearings, in October 2011, that Gorove/Slade had utilized data from a discredited government traffic study in making its traffic volume projections.[53] This led petitioners and ANC 3D to voice additional concerns about Gorove/Slade's report. AU did not initially respond to these concerns, but during its deliberations the Commission requested additional information about traffic issues from the parties. In its response to this request, AU stated that according to Gorove/Slade and the Department of Transportation, the data from the withdrawn study that Gorove/Slade had used did "not have any

---

*(continued…)*

[52] On the other hand, we are not persuaded by petitioners' complaint that the Commission improperly rejected ANC 3D's trip cap recommendation by ignoring traffic issues related to the TDM program and improperly crediting AU's representation that the program would be improved. The Commission addressed the issue with sufficient precision, albeit concisely: it took specific cognizance of the trip cap proposal, found that ANC 3D had not substantiated its claims that the TDM strategies would be ineffective, and explained that a cap would be unnecessary because other measures (including the several elements of the TDM program) would limit trips. The Commission's findings regarding the need for a trip cap were based on substantial evidence in the record, Gorove/Slade's expert opinion that there was "no basis" for it. We think the Commission provided an adequate response to the ANC's concerns in this regard.

[53] It appears that the study had been prepared for the General Services Administration regarding the future development of the Department of Homeland Security's Nebraska Avenue Complex. The GSA reportedly had questioned the analysis in the study and commissioned another firm to redo it.

material impact" on its conclusions. Gorove/Slade itself submitted a response addressed to other traffic concerns raised by the Commission. ANC 3D and petitioners also made submissions, in which they reiterated their original concerns.

Petitioners now complain that they and ANC 3D were afforded no opportunity to cross-examine AU's expert about the factual assertions in AU's post-hearing submissions. However, we do not agree that the Commission acted improperly.

Neither petitioners nor ANC 3D requested an opportunity for further cross-examination or otherwise objected to the post-hearing procedure. In that respect alone, this case is unlike *Glenbrook Road* (on which petitioners rely), where we held it error to deny a request to cross-examine an expert about new matter in his rebuttal testimony.[54] Indeed, for that reason, petitioners' claim is not even properly before us.[55] Furthermore, as in *Glenbrook Road*, we are confident that petitioners were not prejudiced by not having been afforded an opportunity for further cross-examination. The experts already had been cross-examined extensively on almost

---

[54] *Glenbrook Rd.*, 605 A.2d at 43 (D.C. 1992).

[55] *See Fair Care Found., v. District of Columbia Dep't of Ins. & Sec. Reg.*, 716 A.2d 987, 993 (D.C. 1998) ("We have long held that we will not review a procedural claim that was not adequately raised at the agency level.").

all of the issues raised in the post-hearing submissions.[56]  And even if the post-hearing submissions from AU and Gorove/Slade did introduce some new information or opinion, all parties were on an equal footing, unlike in *Glenbrook Road*—neither AU nor petitioners were able to introduce additional oral testimony, and the parties had the opportunity to respond to each other's submissions. Especially given that petitioners did not request an opportunity for further cross-examination, we do not see any impropriety in the procedure that was followed.

### E.  North Hall

The Commission considered AU's further processing application for North Hall in a separate order.  Projected to be completed in 2013, North Hall is to serve as a residence for some 360 undergraduates.  AU proposed to locate it on elevated, sloped terrain on the Main Campus above Massachusetts Avenue near two existing residence halls of similar size and appearance.  As finally proposed after some redesign to meet neighbors' concerns, North Hall is a multi-story structure with a maximum height of approximately 81 feet.  On account of its height, it is required to be set back over 41 feet from the property line on Massachusetts Avenue

---

[56]  *See Glenbrook Rd.*, 605 A.2d at 43-44.

(approximately 84 feet from the sidewalk), and 32 feet from the shared property line with the Wesley Theological Seminary to the west.[57]

There is general agreement that the North Hall site is appropriate for a student dormitory; concerns center on the building's appearance. The Office of Planning approved North Hall's final design. ANC 3D initially supported AU's application to construct North Hall with certain conditions, notably including a requirement that AU redesign the structure to mitigate its "towering effect." At the hearing on the application, however, the Chair of ANC 3D testified in opposition to the project. Asserting that AU had failed to meet the ANC's conditions, the Chair urged the Commission to reject the further processing application and require AU to improve North Hall's design to minimize its visual impact. Petitioner SVWHCA similarly complained that, as proposed, North Hall would be too large and out of character with its surroundings.

---

[57] Applicable zoning regulations required North Hall to be set back from all property lines by at least 41 feet. For its proposed 32-foot setback from the property line with the Wesley Theological Seminary, AU therefore had to request a variance of nine feet. The Seminary endorsed this request, as well as AU's application as a whole.

Rejecting the testimony of ANC 3D's Chair, the Commission found that AU had "adequately responded" to all of the ANC's conditions and that "[t]he siting, design, and façade treatment of [North Hall], in conjunction with the conditions proffered by the University, will ensure that the North Hall residence facility is not likely to become objectionable because of noise, traffic, number of students, or other objectionable impacts." The Commission emphasized that it had given "great weight" to the issues and concerns raised by ANC 3D and "fully credited the unique vantage point that ANC 3D holds with respect to the impact of the proposed North Hall residence facility on the ANC's constituents." Nonetheless, the Commission found that AU had made "modifications to the location and massing of the proposed structure and also enhanced the landscape buffer in response to issues raised by nearby property owners." Among other things, the Commission found that the tallest part of the North Hall structure would be "oriented toward the interior of the AU Campus"; that a "significant vegetated buffer" would be provided around the site; and that AU had "sensitively designed" the building and "effectively utilized the topography of the site" to minimize its visual impact and avoid creating any other objectionable conditions. Based on the results of photo simulations and a balloon test provided by AU, the Commission found "that the setback from Massachusetts Avenue and the significant landscape buffer will shroud views of the structure, while still allowing appropriate views."

The Commission also found it appropriate to grant AU's request for a setback variance in light of the unusually steep grade changes on the North Hall site, the practical difficulty of satisfying the setback requirement along the property line with the Wesley Theological Seminary, and the fact that "[t]he project will comply with the intent of the regulations since the building will be separated from neighboring uses and buildings on the adjacent Wesley Theological Seminary property by a vegetated buffer and additional land areas in excess of the [41 foot] required setback." For these and other reasons, the Commission concluded that North Hall satisfied the special exception requirements for further processing under the Campus Plan (as well as the requirements for a variance).

Petitioners claim that the Commission erred in relying on reports by the Office of Planning that were inconsistent and that misunderstood AU's design changes,[58] and in failing to accord great weight to ANC 3D's concerns about the height of North Hall and the view of it from Massachusetts Avenue. We are not persuaded by either contention.

---

[58] *Cf. Durant v. District of Columbia Zoning Comm'n*, 65 A.3d 1161, 1169 (D.C. 2013) (noting that the Commission acted improperly when it did not address "inaccuracies in OP's reports" that had been brought to its attention).

In response to AU's original design plans, the Office of Planning recommended that the height of North Hall be lowered or otherwise mitigated. Later, reviewing the revised design, the Office was satisfied that North Hall would appear to be only six stories tall (from Massachusetts Avenue) and that the increased setback and landscaped buffer would shroud it from view. Petitioners argue that the Commission should have rejected this assessment because North Hall actually gained a floor when it was redesigned. The record shows, however, that the original plans for North Hall showed it as having a fourteen-foot roof parapet, giving the building a total height of 87 feet.[59] In the revised design, the parapet was removed; in addition, the floors of the building were lowered in height. Although a floor was added on the lower side of the building, the new design stood at approximately 81 rather than 87 feet tall, and was set back approximately 41 feet from Massachusetts Avenue. Consequently, the reports submitted by the Office of Planning, despite some seemingly inconsistent phrasing, were not actually inconsistent or mistaken about the design for North Hall. We therefore cannot find the Commission erred in crediting them.

---

[59] The original design plans show North Hall as situated on a hill having an elevation of 375 feet, and the height of the full building with parapet at 462 feet above ground level, for a difference of 87 feet.

We also are satisfied that the Commission's order sufficiently addresses ANC 3D's concerns about the design of North Hall.[60] Most importantly, the Commission specifically addressed the ANC's concerns about North Hall's height and appearance, finding that the visual impact of the building would not be objectionable given its reduced height, orientation and accommodation to the site's topology, significant setback from the street, and landscaped buffer, among other features. The Commission explained how it arrived at its determination and identified the evidence on which it relied; as the finder of fact, the Commission was entitled to credit AU's tests and simulations and other evidence.[61] Even though its final decision may (in petitioners' words) have flown "in the face of ANC 3D's recommendations,"[62] the Commission was not required to agree with those recommendations, but only to take them into account.[63] That it did. We

---

[60] That the Commission's order does not mention ANC 3D's post-hearing submissions is not, in our view, problematic, because those submissions essentially reiterated the concerns that the ANC previously expressed, and that the order adequately addresses. *See Glenbrook Rd.*, 605 A.2d at 43.

[61] *French v. District of Columbia Bd. of Zoning Adjustment*, 658 A.2d 1023, 1035 (D.C. 1995). The tests and simulations were not opposed by contrary expert testing.

[62] Brief for Petitioners at 46.

therefore uphold the Commission's decision to grant AU's further processing application for North Hall.

### III.  Conclusion

As we have said, the Commission was charged with making "reasonable accommodation[s]" between the University's needs and the neighbors' interests.[64] The challenged orders reflect "a temperate, rational, and balanced approach,"[65] and for the most part we are not persuaded by petitioners' criticisms of them. In a few respects, however, we have found that the Commission's order regarding the 2011 Campus Plan does not sufficiently address certain matters raised by petitioners, the ANCs, and the Office of Planning.  We therefore remand Appeal No. 12-AA-723

---

*(continued…)*

[63]  *E.g.*, *Foggy Bottom Ass'n v. District of Columbia Bd. of Zoning Adjustment*, 791 A.2d 64, 77 (D.C. 2002).

[64]  *President & Dirs. of Georgetown Coll. v. District of Columbia Bd. of Zoning Adjustment*, 837 A.2d 58, 70 (D.C. 2003) (quoting *Glenbrook Rd.*, 605 A.2d at 32).

[65]  *Id.*

for the Commission to address those remaining matters in appropriate further proceedings.[66] The Commission's order in Appeal No. 12-AA-724 is affirmed.

*So ordered.*

---

[66] Petitioners assert that a separate further processing proceeding is required to address the issues surrounding East Campus. AU originally applied for further processing of East Campus as part of its Campus Plan application, and the Commission combined those inquiries. The Commission has broad discretion in deciding how it will conduct its hearings. *Cf. Glenbrook Rd.*, 605 A.2d at 39 (broad discretion with respect to cross-examination); D.C. Code § 2-503 (2013 Repl.) (agency generally establishes own procedures). We presume the Commission will exercise its discretion on remand and conduct further proceedings in whichever way it deems appropriate and in accordance with its rules and the law.